## SUBMARINE BOAT CORPORATION v. UNITED STATES.

### THE SUSPEARCO.

Circuit Court of Appeals, Third Circuit.
March 5, 1929.

No. 3827.

Carroll Single, Single & Single, and William A. Smith, all of New York City, for appellant.

James W. McCarthy, U. S. Atty., of Newark, N. J., and William E. Collins, Sp. Asst. U. S. Atty., of New York City.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This is an appeal from a decree of the District Court awarding to the United States, libelant, damages against the steamship Suspearco in the sum of $4,195.82 for sinking and destroying the Louisiana Wreck Gas and Bell Buoy 1–A at the mouth of the Mississippi river on December 4, 1926.

The buoy marked the location of the wreck of the steamship Louisiana, which

occurred off the mouth of the South Pass of the Mississippi river. This Pass is one of the two important entrances to the Mississippi river from the Gulf of Mexico. The width of the Pass varies approximately from 530 to 850 feet, and its length is 12 miles.

The weather was good, the Suspearco says, when she entered the Pass on her way toward the Gulf at 9:10 o'clock in the evening, and continued so until she was within a mile or two of the South Pass Lighthouse, which is located about 2¼ miles above the mouth of the Pass. A haze then set in and developed into such a thick fog by the time she was abreast of the Lighthouse that it was impossible to see either bank of the Pass. The channel there is about 530 feet wide. The light of the Lighthouse was barely visible, and the bow of a vessel 100 feet away could not be seen.

Those on board the vessel testify that as soon as the fog settled down, unusual precautions were taken to prevent accidents; the third officer was sent forward to keep a lookout from the forecastle head, in addition to a seaman already on lookout there; that another seaman was on the port wing of the bridge; that the master stationed himself on the starboard wing of the bridge; that the chief officer stood close to the man at the wheel and the engines were stopped, and thereafter steerageway only was kept on the vessel by means of an occasional "touch ahead" on the engines, but that "it was impossible to stop altogether owing to the strong 3 to 5 knot current sweeping down the river"; that it was dangerous and impractical to anchor in the Pass because of the strong current and heavy traffic through the narrow channel, and besides the United States government had "forbidden vessels to anchor in South Pass except at one designated anchorage place, three-quarters of a mile above South Pass Lighthouse which the Suspearco had already passed, when the fog set in thick, unless in distress or otherwise disabled"; that when she reached the East Jetty Light, marking the mouth of the South Pass, at 10:40 p. m., the light could not be seen until it was directly abeam; that the engines were then put at full speed ahead and the helm hard astarboard, and shortly thereafter the vessel collided with the buoy and it was sunk.

Capt. Linner of the Suspearco described the collision as follows: "I was looking as well as everybody else, we know there was a buoy there, but we hadn't seen it, so when it came down near the bridge I saw not only the object but also the buoy, but it appeared to me we were twenty or thirty feet away from it anyway. There was some wreckage sticking onto it, looked like log booms, or ship's derricks, like that, you know, big objects. We saw at least twenty feet of it. * * * This ship's side * * * struck this wreckage about abreast of No. 4 hatch, I would think; I noticed the buoy got agitated right away, but the fog was so thick, everything disappeared right away, we lost it."

The appellee, on the contrary, says: That anchoring in the Pass was permitted in unusual weather conditions, and that the weather was unusual and therefore the vessel could have anchored; that the Suspearco was not properly manned; that the only pilot on the vessel was the mate, Jensen, and this was his first trip out of the Pass since the Louisiana was wrecked, and the buoy had been placed there to mark the location; that he was unfamiliar with the exact location of the buoy and did not consult a chart while at New Orleans to ascertain it; that he was ignorant of the proper maneuver to make in order to steer clear of the buoy after passing the East Jetty; that the engines should have been put full speed ahead when the vessel was 300 feet from the light, if it could be seen, as the evidence indicates it could be, in order to clear the buoy, and not when she was abreast of it, as was done; that while the Suspearco's officers testified that the fog was thick and impenetrable, the master's report to the local steamboat inspectors shows that the third officer reported the lighted buoy while the ship was turning at the East Jetty, an estimated distance of between 600 and 900 feet; that in order to support its statement that the current was unusually strong, appellant said that this was "shortly before the height of the recent flood," but the fact is that this collision occurred December 4, 1926, and the Mississippi floods did not occur until the latter part of April, 1927, nearly five months afterward; that as a fact the current was normal, as one of appellant's own witnesses testified; that the engine room log and the deck log were produced only two days before the trial, and the bell book, an important record in a collision, was never produced, although they were requested long before by interrogatories; that the appellant did not call as witnesses the third officer (who acted as lookout), the regular lookout, the seaman on the bridge, the chief engineer, and the junior engineer, who could have given full information about the speed and what bells were received, which was important in the absence

of the bell book; that the only engineer examined was the first assistant, who admittedly was asleep at the time.

The collision of the Suspearco with the buoy was the result of negligence, as the appellee contends; or was an inevitable accident, as the appellant contends.

 Using the name of the vessel for those in charge of her, the Suspearco was presumptively negligent, and can exonerate herself in this case only by showing that the accident was inevitable and could not have been prevented by ordinary precaution and reasonable skill under the circumstances. The Cananova (D. C.) 297 F. 658; The Louisiana, 3 Wall. (70 U. S.) 164, 173, 18 L. Ed. 85; The Virginia Ehrman (The Agnese v. Curtis), 97 U. S. 309, 315, 24 L. Ed. 890. Has she borne this burden?

Taking the Suspearco's own testimony, we do not think that she has borne the burden of showing that she was sufficiently acquainted with the location of the buoy and with the anchorage places in South Pass, that she could not have anchored anywhere in the Pass under the unusual weather conditions which admittedly prevailed at the time and place; that she made the proper maneuver and put on full speed at the proper time and place in order to round the point at East Jetty and not be driven against the buoy by the current, which set in strong in that direction.

When we consider, in addition, the testimony of the libelant which tends to show that the accident was entirely due to the negligence of the Suspearco and not inevitable, but could with reasonable experience, knowledge, and skill have been avoided, we are driven to the conclusion that the decree must be affirmed.