O. F. SHEARER & SONS, Appellant,

v.

CINCINNATI MARINE SERVICE, INC.,
Appellee.

No. 13949.

United States Court of Appeals
Sixth Circuit.

May 31, 1960.

Robert T. Keeler, Cincinnati, Ohio (Nicholas L. White, Cincinnati, Ohio, on the brief), for appellant.

Philip S. Olinger, Cincinnati, Ohio (Earl T. Barnes, Cincinnati, Ohio, on the brief), for appellee.

Before SIMONS, POPE and O'SULLIVAN, Circuit Judges.

POPE, Circuit Judge.

Appellant, libellant below, is a partnership which owned and towed barges on the Ohio River. Appellee-respondent is a corporation which owns and manages a harbor in the Cincinnati basin area of the Ohio River, for the purpose of loading, unloading and storing barges and assembling tows.

On January 31, 1956, four empty barges belonging to libellant were left at respondent's landing and were tied off alongside of 15 other barges thereby creating a fleet of nineteen empty barges. Early the following morning the entire fleet of empty barges broke loose from their moorings, and with the landing float to which they were attached they were cast adrift. One of libellant's four barges, known as barge OFS 195, was damaged prior to its recovery. This suit in admiralty was brought to recover that damage. The appeal is from a judgment for respondent.

In seeking recovery libellant proceeded upon the theory that respondent, as bailee of these barges, was under a duty to exercise reasonable care for their safety, maintenance and protection; that proof of the delivery of barge OFS 195 in good condition, and its return in a damaged condition, gave rise to "a presumption of fault on the part of the appellee which the latter had to meet"; that the "burden of going forward with the evidence shifted to appellee". It as-

serts that appellee failed "to rebut the presumption of its negligence", hence that appellant should have had judgment. It further asserted that respondent was guilty of negligence in certain specified respects and that this negligence caused the damage complained of.[1]

The trial court found that what caused the barges to be cast adrift was that the fleet of barges "was struck by a drift pile, floating down the river", and that this was "an unexpected event which could not have been anticipated." It found that respondent's methods of securing the fleet to the shore "were customary under the circumstances," and that respondent "took the precautions common to the industry" and that there was no evidence of "other or further precautions which could or should have been taken." Accordingly, the court found respondent not negligent.

The evidence clearly sustains the finding that it was floating drift pile that carried away the barges. The river had been rising and had reached an "open river" condition; that is to say, without control of locks or dams. It had risen some 10 feet in the 48 hours prior to the time the O.F.S. barges were tied up and it continued to rise during the night following. On the evening before the break-away respondent's chief officer gave orders to his men to narrow down the fleet of 19 empty barges for the purpose of keeping the outside barges away from the current and its driftwood. At the time of the accident this fleet, including the landing float, was four barges in length and five in width, extending 130 feet from shore. The current, and the flow of driftwood, usually ran about 200 feet offshore. It would appear therefore that the outer empty barges were about 70 feet from the main current.

Upstream, and some 75 to 100 feet distant from the fleet of empty barges, a fleet of nine loaded barges was tied. Downstream, below the empty barge fleet, was another fleet of four loaded barges. The loaded barges lay some 6 to 7 feet deeper in the water than did the empty ones.

No one who testified saw the fleet of empty barges carried away. It was shown that shortly before this happened a very large body of floating drift was coming downstream toward respondent's landing. Beatty, who was respondent's president and general manager, checked the barges and floats shortly after 6 P. M. on the evening of January 31. The next time he saw the fleet of empty barges was about 5:30 the next morning when he was called on the telephone by one of his men at the landing and was informed that the empty fleet broke loose. Beatty laid down the telephone, stepped out on his front porch from which he had a view of the river, and saw the middle fleet of empty barges and the four loaded barges of the lower fleet some 1200 feet down the river from where they had been moored.

The most significant evidence that the barges were carried away when struck by floating driftwood was the fact that when the barges were recovered downstream there was a mass of debris and driftwood under the sections of the fleet then recovered. Only with considerable difficulty could this be shaken loose. In the midst of some of this debris there was found a white oil drum. Such a white oil drum had been seen on the large drift pile as it floated downstream above respondent's harbor. And while the upper fleet of nine loaded barges was not dislodged, there was some driftwood on the edge of the two lower outermost barges.[2]

1. The libel set forth two causes of action. The first alleged the bailment of the barge to respondent in good condition and its return in damaged condition; the second alleged negligence on the part of respondent in six different respects, and that the damage was caused by such negligence.

2. The landing float to which these empty barges were tied was secured to the shore by various lines of wire cable, an inch to

Although the evidence thus sustains the finding that it was the drift pile that struck and carried away the barges, the other findings that there was no evidence of further precautions that could have been taken, that the striking of the fleet was unexpected, and there was no negligence, require more scrutiny; for there was definite evidence of negligence, and a significant failure to account for respondent's actions, or failure to act, at a critical time just prior to the breakaway.

Respondent had three tugs, one of 300 horsepower, one of 490 horsepower, and one of 550 horsepower. During the early morning of February 1, while it was still dark, the second of these, in charge of respondent's pilot Roberts, was proceeding upstream headed for Coal Haven, about four miles above respondent's landing. At that landing respondent had a main landing boat, equipped with office and living quarters for employees. The men on watch were not allowed to leave the boat.

There were at least three men on watch at the landing at the time Roberts was proceeding upstream. They were Sant and Lawrence; both of whom had authority to give orders, and Sivasky. Lawrence was in charge of the night crew; Sant was the night dispatcher; Lancaster, a pilot employee, lived up the hill above the harbor boat. Later, when Lancaster was called by telephone, he was still asleep but he reached his tug in "a very few seconds." Beatty was similarly within call.

As Roberts proceeded upstream, at the time mentioned, his deckhand called his attention to what was first thought to be some loose barges coming toward them down the river. They were then about a mile and a half or two miles up-

stream from respondent's landing. They flashed a light on the object and then saw it was a drift pile. It was "a pretty large one". On it they saw a white oil drum. Roberts, who had many years' experience on the river, and as a harbor pilot, testified that he had never seen a drift pile the size of that one. At any rate, Roberts was apparently aware that it presented potential danger to the landing for when he saw it he radioed in to the landing and talked to Lawrence and told him "to be on the lookout for this drift pile. * * * I told him it was a big one." This was 30 or 35 minutes before the barges broke away.

It is thus obvious that a knowledge of what respondent's employees did, or failed to do—the choices they made, in this 30 minutes is vital to a determination as to whether respondent did or did not exercise care in the protection of the barges—for during that period respondent's employees then on duty at the landing knew that a pile of driftwood was coming—and that it was a big one. When Lawrence got that call he must have known that danger was imminent—otherwise there would have been no point in calling him.

There was something else that must have been known to the men then present for other witnesses who were called knew about it and explained it. That is, that the upper fleet of loaded barges was available as an effective barrier to any drift. As these loaded barges were tied they would "curve out on the tail end". This served the purpose of causing driftwood that came down alongside the loaded barges to "sheer off of those and go around the empty fleet."

It is plain that this drift pile was able to strike the empty barges, go under them, and carry them away, because the

1¼ inches in diameter. These cables were secured to trees on the bank. It was testified that the headline was wrapped around two trees, one 18 inches to 2 feet in diameter, the other 16 inches in diameter. Other lines were secured to other trees. When the fleet went out the trees were pulled out by the roots and

were still attached to the float when it was later recovered downstream. It is a fair inference that the drift pile went under the empty barges which floated high in the water and carried them away in one mass, and that they then struck the fleet of loaded barges below which broke its cables.

loaded fleet was anchored some 75 to 100 feet above and away from the empty barges. This gap between them was to leave a passageway for the tugs to go in behind the upper fleet of loaded barges, where they were kept. The opening was such as to permit the driftwood, when it came, to strike the empty barges at this gap.

Again, it will be recalled that the big drift, when it did strike, apparently hit the lower two of the loaded barges, but while it left debris on the sides of these barges, it did not go under them for they sat some 6 feet deeper in the water than did the empty barges. It must also be noted that two of the tugs, one of 300 horsepower, and one of 550 horsepower, were right there. After the breakaway occurred, and pilot Lancaster was called and reached the landing in a matter of seconds, he found that engines of the boat were already running as the night watchman had started the boat. It is a fair inference that the tugs could be started at once.

The significant thing about this thirty minute period is that respondent wholly failed to account for it, or what happened during that time. Of the three men known to have been present there, the whereabouts of two of them, Lawrence and Sivasky, was known to respondent—they could have been called, but they were not. Had they been called, more than one question as to matters highly important here could have been put to them.

When Lawrence received the call from Roberts about the drift pile, that it was a "big one" did he appreciate that it was, as respondent's counsel called it, an "enormous drift pile," and hence that the fleet was in peril?[3] Did he think about summoning help from Beatty and Lancaster? Did it occur to these men that if the loaded fleet were moved down 100 or more feet toward the middle fleet, so as to fill the gap between the two fleets, and so placed as to screen the empty barges, the latter would be protected by the deeper, loaded barges from the drift that went under the empty ones? Why were the tugs ready at hand, not used for this purpose? It seems to us that if the crew on the landing, when the call came, knew and appreciated, or should have known or appreciated that possible danger was only 30 minutes away, then their merely doing nothing was negligence.

■ In a situation such as this the rule is as follows: "Since the bailee in general is in a better position than the bailor to know the cause of the loss and to show that it was one not involving the bailee's liability, the law lays on him the duty to come forward with the information available to him (cases cited). If the bailee fails it leaves the trier of fact free to draw an inference unfavorable to him upon the bailor's establishing the unexplained failure to deliver the goods safely." Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 111, 62 S.Ct. 156, 161, 86 L.Ed. 89.

■ Of course, as the court there noted, this inference does not shift the burden of proof, and if the bailee does "go forward with evidence enough to raise doubts as to the validity of the inference, which the trier of fact is unable to resolve", then the bailor may lose for failure to sustain the burden with which he started. But here, the respondent bailee did not go forward with evidence, as was its duty, with respect to what occurred in this crucial period. It has left us with the unavoidable inference, unfavorable to it, that due care was not exercised at the very time when it was most vitally needed.[4]

3. Captain Young, a licensed master pilot, with 52 years experience on boats in the river, testified that large drift piles were common on a fast rising river; that rivermen referred to them as "acres of drift."

4. Oddly enough, respondent's brief suggests that the men may have been sleeping during this period. It says "Would it be unreasonable to assume that the two men on stand-by duty were sound asleep?" There is no evidence of that, and we disregard it.

Respondent presents a question posed here as follows: "Did the appellee sustain the burden of proving the defense of 'inevitable accident' on which it relied?" If this is properly the issue here, the answer is suggested by what was said in The Lackawanna, 2 Cir., 210 F. 262, 264. The court said: "The defense of inevitable accident has, in some cases, been held to be established even when the real cause is not definitely ascertained. In all such cases, however, all possible causes have been exhaustively covered, and it has been shown, as to each and all of them, that the proper exercise of reasonable care by owner, master, officers, and crew would not have avoided them."

In that case the steersman at the wheel of The Lackawanna when it turned erratically and collided with the Chieftain was not produced to testify. Some bolts which came out of the steering apparatus, and were on hand after the accident, had disappeared before the trial. Said the court: "We are not told whether the rudder was loose or what caused the steering gear to break down. It may have been the result of a defect in the steering engine or of the steersman's negligent handling of the wheel. These are among the possible causes which are not eliminated. * * * In this condition of the proof we do not think it can be found that all possible causes have been enumerated and satisfactorily accounted for."

The principle stated in that case was the same as that applied by this court in Austerberry v. United States, 6 Cir., 169 F.2d 583, 593. That also was a proceeding in admiralty seeking limitation of liability for damages arising because of fire following an explosion on petitioner's vessel. Petitioner was the United States. One of the factors present was the failure to produce certain physical evidence. This court said (at page 593): "It is also to be observed that although the tank and other equipment of the boat were in the possession of the government at the time of the trial, they were not produced despite the fact that the government expert testified he would have been able to contribute more in the way of explanation of the explosion and expert opinion evidence if he could have seen the tank. Since it was not produced, the presumption is that its production would have constituted evidence unfavorable to the respondent, and in such a case, the court is justified in concluding that the proof, if offered, instead of rebutting, would sustain the case against the government." See in accord: The Bertha F. Walker, 2 Cir., 220 F. 667.

The same sort of presumption has many times arisen in suits in admiralty where there has been a failure of a party to produce or account for a witness. The rule is one of general application and not limited to admiralty, but the courts have plainly recognized that it is especially and peculiarly applicable there.[5] The

---

5. Of course, in an admiralty case, the witnesses are often members of a party's crew, and hence they are primarily available to that party. Failure of such a party to produce a crew member may well have the consequences here referred to. In The Cananova, D.C.E.D.Pa., 297 F. 658, 662, the court said: "It is well settled in admiralty that the absence of an important witness whose testimony could have been procured through reasonable diligence warrants the inference that his testimony would not have been favorable to the party by whom he should have been called."

In The Louise Rugge, 3 Cir., 239 F. 458, 462, the court was considering liabilities arising from the collision of the Rugge's tow with a draw bridge. Libellant produced one witness who testified against the bridge operators. In commenting on this the court said: "To controvert this testimony, meagre as it was, the appellant [bridge operators] produced no witnesses, not even the men who raised the span and who were engaged upon the work at the time of the accident. Such an omission in admiralty raises a damaging presumption."

In Culbertson v. The Southern Belle, 18 How. 584, 588, 59 U.S. 584, 15 L.Ed. 493, the Court said: "The captain of the steamer was not sworn, and from this a strong presumption arises that his evidence would have been against his owners."

**74**

situation is similar to failure to produce a ship log—"an inference of fault naturally arises." The Philadelphia, 3 Cir., 44 F.2d 1, 4.

In The New York, 175 U.S. 187, 204, 20 S.Ct. 67, 73, 44 L.Ed. 126, the Court said: "The force of this presumption of a defective lookout is greatly strengthened by the fact that the claimant did not see fit to put upon the stand the officers and crew of the New York, who certainly would have been able to explain, if any explanation were possible, why the lights of the Conemaugh were not seen and distinguished or her signals heard. It was said by this court in the case of Clifton v. United States, 4 How. 242, 246 [11 L.Ed. 957], that 'to withhold testimony which it was in the power of the party to produce in order to rebut a charge against him, where it is not supplied by other equivalent testimony, might be as fatal as positive testimony in support or confirmation of the charge.'"[6]

We think it is manifest here that the respondent did not perform its duty of going forward with the evidence as it was required to do under Commercial Molasses Corp. v. New York Tank Barge Corp., supra, and wholly failed to overcome the inference that during the crucial half hour period respondent's employees simply did nothing and failed to summon the help or to utilize the available facilities which could have sufficed to protect the fleet of empty barges against the danger which reasonably they should have foreseen. It is no answer to say that they might have tried all the means suggested and yet have failed. An automobile driver confronted with an imminent collision who fails to use his brake is not cleared of negligence simply by showing it possible that even if he had used the brake the collision might not have been avoided.

The necessary conclusion here is that the record establishes that respondent's employees did nothing in the face of danger which they reasonably should have anticipated. The authorities we have cited sufficiently disclose that we are warranted in inferring that they did know of the danger and that the means were at hand by which the accident might reasonably have been avoided.[7]

---

In an early decision of Judge Benedict, The Fred M. Laurence, D.C.E.D.N.Y. 1883, 15 F. 635, 637, the court said: "This [important] witness is not called, nor is any excuse for his non-production given. The presumption, therefore, is that his testimony would not support the libellant's case, and in such a conflict this presumption is controlling."

6. The following cases, all in admiralty, recognize and apply the presumption of adverse testimony when important witnesses are not produced or satisfactorily accounted for,—they hold that an inference adverse to the party or unfavorable to him may be drawn from such failure to produce.

"He did not testify, however, and the failure to call him raises a presumption that his testimony would have been unfavorable to the Condor if he had been called." The Condor, D.C.S.D.N.Y., 8 F. Supp. 929, 932, affirmed The Nordpol, 2 Cir., 84 F.2d.3.

"It is a rule based fairly on common sense that a failure to call a witness in such circumstances raises a presumption that he would have given unfavorable testimony if called." The Eastchester, 2 Cir., 20 F.2d 357, 358.

The Georgetown, D.C.E.D.Va., 135 F. 854, 859; Coyle Lines v. United States, 5 Cir., 195 F.2d 737, 741; Submarine Boat Corp. v. United States, 3 Cir., 31 F. 2d 684, 685; Lykes Bros. S.S. Co. v. The A. W. Whiteman, D.C.E.D.La., 138 F.Supp. 725, 726; Yachts, Inc. v. The Edward F. Farrington, D.C.E.D.N.C., 146 F.Supp. 754, 758; The Daniel Kern, D.C. W.D.Wash., 27 F.2d 920; Consolidated Coal Co. v. Knickerbocker Steam Towage Co., D.C.D.Me., 200 F. 840, 845.

See cases collected in an annotation at 5 A.L.R.2d 901, 902.

7. This case, in which none was held, illustrates the usefulness of pre-trial conferences which usually serve to sharpen the issues and disclose to the parties where their real differences lie. The failure of the trial judge to deal with the warning by Roberts and the failure to produce the witnesses as to what then happened would appear to be due to the fact that libellant's counsel tried his case at great length and almost exclusively upon the fruitless theory that the barges

As there was no question as to the amount of damages, the decree is reversed and the cause is remanded with directions to enter decree for libellant for the amount prayed for in its libel.

were not properly secured to the shore. The points which we think were significant were well buried.

