**HAMPTON ROADS CARRIERS, INC.,**
Appellant,

v.

**ALLIED CHEMICAL CORPORATION,**
Appellee.

No. 9131.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 12, 1963.

Decided March 16, 1964.

R. Arthur Jett, Jr., and R. Arthur Jett, Norfolk, Va. (Jett, Sykes & Berkley, Norfolk, Va., and Smathers & Thompson, Miami, Fla., on brief), for appellant.

Francis N. Crenshaw and R. M. Hughes, III, Norfolk, Va. (James H. Simonson, New York City, Baird, Crenshaw & Ware, Seawell, McCoy, Winston & Dalton, Norfolk, Va., and Bigham, Englar, Jones & Houston, New York City, on brief), for appellee.

Before BRYAN and BELL, Circuit Judges, and CRAVEN, District Judge.

ALBERT V. BRYAN, Circuit Judge.

Foundering of barge BA–1401 in Chesapeake Bay, with total loss of her lading of some 1400 tons of sodium sulphate (salt cake) was attributed by the District Judge to unseaworthiness. On this finding he decreed damages against her owner,[1] appellant Hampton Roads Carriers, Inc. (Barge), in favor of appellee Allied Chemical Corporation, cargo owner and charterer of the barge (Cargo). Consistently, he dismissed the barge owner's petition for exoneration or limitation of liability,[2] the proceeding in which Cargo's claim was pressed. At the same time Barge's counterclaim upon Cargo for improperly loading and so causing the constructive loss of the barge —necessary repairs exceeding her restored value—was denied.

We must set aside the award against Barge. The ultimate factual inference of unseaworthiness is not sustained by the subsidiary findings, but even if existent the fault was excused under the terms of the charter party by Barge's diligence in seeing to her seaworthiness. Decision on the counterclaim is affirmed as a finding not clearly erroneous.

The contract of affreightment, dated May 22, 1958, covered a cargo barge and suitable towboat for transportation of salt cake from North Claymont, Delaware to Jacksonville, Florida. Tug Falcon and barge BA–1401 were furnished for the purpose by Barge. As the tug, owned by another party, was exonerated of all blame, she will not be considered in our discussion of Barge and Cargo liabilities. The pivotal stipulation of the voyage agreement was this:

"25. General Exceptions Clause: (A) The Vessels employed herein, the respective master and Owner shall not * * * be responsible for any loss or delay arising or resulting from * * * *unseaworthiness* of the Vessel or Vessels whether existing at the beginning of the voyage or developing during the voyage *unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy.* * * *" (Accent added.)

The BA–1401, built in Louisiana in 1950 and acquired by Barge in September 1958 at New Orleans, was constructed of welded steel, with flat bottom and straight sides, and raked at both ends. Her dimensions were: length 195'; breadth 35'; depth 11'. A hopper, serving as a cargo hold, was 140.5' long, 29' wide, and 8.5' deep. The hull was divided into 10 separate watertight compartments, consisting of 4 wing tanks on each side and one tank each in the forward and afterpeak.

When purchased she was afloat. In the transaction Barge was represented by its president, Batchelder, and Jack Faulkner, a shipbroker devoting some time to marine surveys. Both examined the barge. United States Salvage Association was engaged to inspect her for hull insurance on a trip in tow from New Orleans to Jacksonville. This inspection, made both in the water and drydock, was attended

---

1. Actually a contract-purchaser.

2. 46 U.S.C. § 183 (1958).

by Faulkner as Barge's representative. The report was that the barge had been inspected "in all of its parts as far as permissible without making removals to expose parts normally concealed and the hull found in apparent satisfactory condition. In the opinion of the surveyors in preparing the vessel for the proposed trip in tow * * * every precaution, to the extent that its design, dimensions and fittings permitted has been taken to put it in such condition as to safely endure the weather and sea conditions normally to be expected on the voyage." Certain work recommended by the inspectors was completed before the trip was undertaken. Usual conditions were also included to the effect that the report should not be used in connection with the purchase, hiring or freighting of the vessel.

Since the Jacksonville journey would entail deviation from the inland waterways at points in Florida, an inspection by the Coast Guard to authorize the outside passage was required.[3] Its approval was obtained in a certificate dated September 6, 1958. Traveling light, the barge reached Jacksonville without concern, whence she was towed via the Inland Waterway to Norfolk, Virginia. A survey of the barge was made there for Cargo and its cargo insurers to ascertain the condition of the barge and its suitability to move a lading of salt cake. Following this she was taken to North Claymont, and later to a Camden, New Jersey shipyard, where the hopper was repaired to satisfy certain conditions pointed out by Cargo. Under the charter party the barge then carried 879 tons of salt cake to Jacksonville, quite uneventfully. On her return she picked up approximately 1200 tons of roll paper at Georgia ports and delivered it to Paulsboro, New Jersey and Chester, Pennsylvania without significant misfortune.

On November 7th about 4:40 o'clock P.M. loading of salt cake was commenced for her second and fateful trip south.

Next morning, November 8th, with 1411 tons stowed in the hopper she was drawn by the Falcon down Chesapeake Bay until rough weather was met at 11:55 P.M. She tied up at Tolchester Beach for the night, resuming travel at 6:30 A.M., November 9th. An unfavorable afternoon weather forecast caused the flotilla to seek shelter in the Patuxent River until the early morning of November 11th. Passing the mouth of the Potomac River near noon that day, the master of the Falcon in observing sternwards saw his tow apparently shipshape, following well on a 600-foot cable. In a short while, however, towboat Condor bound upstream spoke the Falcon to warn her that the barge was sharply down by the stern. The Falcon answered that the cargo had been trimmed with a slight stern drag to the barge for easier handling. Within 20 or 30 minutes Falcon's tugman shouted that the barge was settling fast.

At once the captain tried to beach her or at least shoal her water, but as she did not respond, the towing hawser was cut. The BA–1401 started down sternforemost, heeled to port and momentarily stood on her beam-ends. Though not capsizing she careened steeply to dump her cargo. Immediately the barge righted, but with only a few feet above water at the starboard bow. She filled and sank at 10 o'clock that night.

The next day a diver examining the barge on the Bay bottom observed severe damage along the entire port side of the hull, including a deep longitudinal indentation. She was not raised until June 1959. Meanwhile she had been brought up 15 or 20 times, slipping back in each instance. Finally in June 1959, salvage operations succeeded; she was taken to Norfolk and hauled on the railway. All interests appeared for the survey.

Hull fractures were visible in several places. One, 12 feet long, was at No. 4 tank which is adjacent to the afterpeak tank. This fracture extended athwartships along a weld now said to have been

---

3. United States Revised Statute § 4421 (1873–74), now incorporated in 46 U.S.C. § 399.

inadequately made. The edges of two hull plates there had been welded without first making a v-separation between them, with the wide end of the "v" facing the exterior of the hull, so as to provide a larger area on which the weld could take hold. A surveyor, who testified as to his examination after the sinking, said the criticized weld was not discernible upon looking at the bottom of the hull from below but was observable from above—apparently meaning from within the No. 4 tank. Other damage included several transverse arches or bucklings in the centre one-third of the hull bottom.

■ I. "The test of unseaworthiness", it was said in The Silvia, 171 U. S. 462, 19 S.Ct. 7, 43 L.Ed. 241 (1898), "is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport". The Southwark, 191 U.S. 1, 9, 24 S.Ct. 1, 48 L.Ed. 65 (1903); Bank Line v. Porter, 25 F.2d 843 (4 Cir.), cert. denied, 278 U.S. 623, 49 S.Ct. 25, 73 L.Ed. 544 (1928). The sinking of the barge in fair weather and smooth water was the point at which the trial judge quite correctly commenced, for that fact prima facie proved unseaworthiness.

More specifically, he adverted to the fracture near No. 4 tank. As the barge initially immerged at the stern, he reasoned that the Bay waters had first been admitted into this tank at the fracture, and thence made into the afterpeak tank through some defect in the bulkhead between them. This was the opinion advanced at the trial by an expert witness reconstructing the cause of the accident three years afterwards. Under his theory the barge would have remained afloat despite the flooding of No. 4 tank, so that only ingress of the water from No. 4 into the aftermost tank would have sunk her. The Court concluded "it is not unlikely that this was the major cause of the sinking when the proper inferences from the testimony are considered". However, as both parties conceded, there is no evidence whatsoever to establish that the

hull fracture occurred before the foundering of the barge. On the second hypothesis the Court stated: "[T]here is no affirmative evidence of such defective bulkhead".

That the weld did not fail "as a result of fracturing under stress, or * * * from simple corrosion" was the opinion of engineer and surveyor Pillatt. He was employed by Cargo to inspect the barge, soon after she was raised and hauled, "to ascertain the nature and extent, as well as possible causes of damages". He testified that the weld showed poor workmanship, but "no definite cause· of the sinking could be determined". Six possibilities were listed by him, including this fracture and improper or overloading. In a report dated January 6, 1959, surveyor Jaeger, who had been employed as Cargo's representative at the last pre-loss inspection of the barge, indicated that she was "overloaded at the time of the casualty". This, too, was the report of surveyor Eirich, Barge's witness. Both repeated this opinion after recapture of the barge.

The evidence makes it quite manifest, too, that this fracture and any injury to the bulkhead could have been the result of the ship's wrenching in distress. Other fractures noted in the hull were accepted as caused by this violence. As she writhed in her attempt to jettison the salt cake, to resist the clutches of the Bay, obviously she must have undergone tremendous stresses and strains upon her seams. The convulsions evidently shifted the 1400-ton cargo, putting enormous pressures upon the entire structure of the barge. Additionally, the 15 or more attempts to bring her up, and her falling back each time to a depth of 42 feet, might well have inflicted serious damage to the hull.

■■ Cargo's own surveyors at Norfolk on October 7, 1958—six weeks before her loss—had reported on their inspection that the "barge was in a satisfactory state of preservation". Again, the barge's behavior on the prior trips mil-

itates against the concept of unseaworthiness. At no time had she revealed weakness in any member. From the hour she left home port the second time until the moment she began to submerge there was not the slightest change in her trim. Soundings were taken regularly on this trip and in no tank was water found. The awful suddenness of the sinking, against this past experience, hardly suggests unseaworthiness. Cf. Peter Paul, Inc. v. Rederi A/B Pulp, 258 F.2d 901 (2 Cir. 1958), cert denied, 359 U.S. 910, 79 S.Ct. 586, 3 L.Ed.2d 574 (1959). It points rather to a shift in the lading.

This chronicle of events and circumstances accords with the District Court's subsidiary findings. The only proof of infirmity in the vessel is the fact that she sank, plus the suggestion of the cause offered by the expert witness several years later as the rupture at No. 4 tank, assuming a leak in the bulkhead. Her history and the testimony of the surveyors—for Cargo as well as for Barge —upon inspection of the barge before the sinking and after she was raised refute the charge of unseaworthiness.

The District Court's determination of unseaworthiness from these factual premises we think was clearly not justified. At the minimum the facts were evenly balanced on the issue, a possibility the District Judge recognized. But he declared that any such "doubt must be resolved against the owner of the barge and in favor of the shipper". This too was error. Barge was not a common carrier and so Cargo had the burden to prove unseaworthiness. Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, 110, 62 S.Ct. 156, 86 L.Ed. 89 (1941).

■■ II. But had the evidence disclosed unseaworthiness, Cargo still could not recover. Under the charter party, as we have noted, only "want of due diligence on the part of the owner" can impose liability for unseaworthiness. Here the burden was upon Barge to prove itself requisitely diligent. Metropolitan Coal Co. v. Howard, 155 F.2d 780 (2 Cir. 1946). We think it acquitted itself.

Three surveys were made to find out if the barge had the strength and other qualifications to lift the salt cake. The earliest of these inspections was not more than 60 days before the loss of the barge, the last about 40 days. The first was to ascertain if Barge could get hull insurance before she left New Orleans for Florida. At that time Barge explained to the surveyor that it was depending on his report in making the purchase. She passed this test—in drydock as well as afloat—after complying with the inspector's directions for repairs. Later, the United States Coast Guard approved her for the run. Not conclusive of course, nevertheless these surveys are not to be discarded entirely in canvassing the attention exerted by Barge to discover deficiencies, especially in the hull. See Artemis Maritime Co. v. Southwestern Sugar & Molasses Co., 189 F.2d 488 (4 Cir. 1951); Frederick Snare Corp. v. Moran Towing & Transportation Co., D.C., 195 F.Supp. 639, 647 (1961).

Of special significance is the September inspection at Norfolk about six weeks before the mishap. It was in effect a joint survey. Representing Cargo were its two chosen surveyors, whose competency is not challenged. One of these was the Jaeger already mentioned. Barge was represented too, apparently for the purpose of providing such repairs as might be shown by the survey to be needed. This, we think, evinced diligence.

Jaeger's report was:

"The barge generally was in a state of preservation and two (2) small fractures were noted at the time of the inspection and *pointed out to the owner's representative who instituted repairs immediately.*"

\* \* \* \* \* \*

"As far as may be ascertained from a general examination of this barge afloat without removals or opening up to expose parts ordinarily

concealed, and without taking borings to ascertain thickness of structural members, or testing for tightness, it is the opinion of the undersigned that the *hull* and equipment will be in satisfactory condition for operation, if and when, the foregoing recommendations are completed as projected." (Accent added.)

Surely, Cargo cannot now contend that Barge was lacking in diligence when it accepted the report and recommendations of Cargo's own selected surveyors. If Cargo wished to develop Jaeger's inspection as not thorough—merely to meet insurance requirements—Cargo had only to call him to the stand. He was a resident surveyor in Norfolk where the cause was heard. Moreover, he was named in the pretrial memorandum as a witness Cargo intended to offer. As the representative of Cargo he could have detailed the manner of the inspection. Yet Cargo deliberately omitted to call him. With characteristic candor, its counsel tell us why: because he would say that the sinking was due to faulty loading.

This omission may have been advisable trial strategy—as the least hurtful—but it does not erase the adverse implication. His absence is damaging indeed. It implies that he would have testified to an inspection fulfilling the exactions of due diligence. O. F. Shearer & Sons v. Cincinnati Marine Service, 279 F.2d 68, 73 (6 Cir. 1960).

Before loading at North Claymont Cargo became worried about water in the hopper. Thereupon the barge was at once taken to a shipyard to find and correct any defect responsible for the water. All of this was done in association with Cargo. Barge's president stayed with her to see that the job was satisfactorily completed. Two steel doublers were placed in the hopper to seal small holes through which the water had seemed to "boil up". These were to secure the hold,

not the hull. When she was finally submitted to Cargo and pumped out "it was determined she was not leaking." These repairs and the condition of the hopper were approved by Cargo for a *dry* cargo.

This approval is conclusively established by the requirement of the charter that the charterer "prior to loading, [must] inspect the holds of the vessel and refuse to load should the same be found unfit for the carriage of the cargo". Again, "[A]cceptance of the vessel by the Charterer or loading the cargo shall be a complete fulfillment of the Owner's obligation under this clause". Thus, on the last as well as the first shipment of salt cake, Cargo was in no position to assert defectiveness in the hopper.

Our view is, to repeat, that the evidence fails to show Barge neglectful in looking to the vessel's seaworthiness.

■ III. While the method of loading the barge may have been responsible for a fatal shifting of the lading and thus might well have accounted for the sinking, we are not persuaded that the District Court was clearly in error in concluding otherwise. Here, again, decision must be rested on the place of the burden of proof, as the cause of the disaster cannot be known exactly. It was Barge's obligation on the loading issue, and we cannot say the District Judge did not have ground for his determination of failure on the part of Barge in this regard.

The decree of the District Court will be reversed insofar as it holds Barge, Hampton Roads Carriers, answerable to Cargo, Allied Chemical Corporation, for the loss of the salt cake, but it will be affirmed in denying the counterclaim of Barge against Cargo. The suit will be remanded for the entry of a decree consistent with this opinion.

Affirmed in part and reversed in part and remanded.