**OLD COLONY INSURANCE COMPANY,**
a corporation, Libelant,

v.

**The SS SOUTHERN STAR,** her engines, tackle, machinery, and equipment, and any and all persons claiming any interest therein, and Bacong Shipping Company, S. A., a corporation, Respondents.

**Bacong Shipping Company, S. A.,**
a corporation, Claimant.

No. 65–548.

United States District Court
D. Oregon.
March 15, 1967.

Dennis Lindsay, of Krause, Lindsay & Nahstoll, Portland, Or., and Kent J. Clancy, of Derby, Cook, Quinby & Tweedt, San Francisco, Cal., for libelant.

Erskine Wood, of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for respondents and claimant.

BEEKS, District Judge.

The Court is satisfied from the evidence in this case that bulk copra tends to heat and to give off moisture during an ocean voyage. It is subject to spontaneous combustion. The higher the moisture content the more heat it will generate and the more moisture it will expel. For this reason it can be dangerous cargo if the bags and/or the contents are wet at the time of shipment. These characteristics were known to Captain Farrales.

Copra cake pellets are likewise subject to spontaneous combustion which may result from moisture (usually from an external source) and heat, if the heat and moisture are not dissipated or removed from the stowage area.

The Court is convinced that respondent-claimant (Carrier) violated Section 3(2) of COGSA; 46 U.S.C.A. § 1303(2) in the particulars hereinafter stated and that such derelictions proximately resulted in the damage by fire.

It was negligent to stow the pellets over the bulk copra and in so doing to place bamboo mats over the bulk copra, all of which restricted ventilation and escape of moisture.

It was negligent to permit the bulk copra to become "drenched" with rain-water and immediately thereafter to load additional bulk copra on top of that which was drenched. Such stowage created a dangerous condition. It appears in the vessel's log book that at 1930, September 27th, the copra inside the holds was "drenched." It is true that Captain Farrales minimizes the wetting of the cargo but his credibility resembles the condition of Humpty-Dumpty after his mythical fall—shattered beyond repair. He first denied there was any wetting from rain of the cargo being loaded on September 27th. When confronted with the log book he professed ignorance of the term "drenching" although his signature appears under the entry in the log. He later concedes, however, that a minimal amount of rain entered the stowage compartment through a very small open section but that the copra was dry within an hour. "Drenched" is defined by Webster's New International Dictionary as soaked, immersed, saturated, submerged, covered with water. The Court accepts this definition as being indicative of the state of the cargo rather than the superficial wetting testified to by Farrales.

Between October 9th and October 11th at Zamboanga copra pellets were loaded on top of the bulk copra in number one hold. The vessel completed loading bulk copra and copra pellets at Zamboanga the following day. Thereafter the vessel proceeded to other Philippine ports (Baler and Diapitan) where a deck cargo of logs was lifted and the deck stowage thereof was completed on October 30th. The vessel then proceeded to Cebu for provisions, bunkers and repairs, primarily the latter, as the Chief Engineer refused to sail with the vessel for Europe unless the crosshead bearings of the main engine were repaired prior to departure from the Philippines. These functions were concluded on November 10th whereupon the vessel departed for Genoa, Italy. Thus, all bulk copra, including that which was drenched, was in number one hold a period of approximately forty-four days before the vessel commenced its voyage. During substantially all of this period the vessel was in port the winds were minimal and the temperatures high. Accordingly, natural ventilation was practically nonexistent and carrier did not use blowers or other means of forced ventilation.

It may very well be, as contended by carrier, that the time consumed in the loading of logs for owner's account and the time consumed in bunkering, provisioning and repairing, principally the latter, was a permissible liberty. In the sense that it would not be a deviation this is possibly true. The Court finds, however, that in the circumstances aforesaid, it was careless and unreasonable to so prolong the voyage, and that such delay and prolongation was also a direct and proximate cause of the fire and damage.

In short the Court finds that libelant's contentions numbered 1, 2, 3, 7, 8a, 8b (2), (3), 8c, and 8e have been established.

The damage having resulted from fire, the critical question is whether libelant's contention number 9 has been established.

As carrier points out the delay and prolongation of the voyage, including any neglect in the care and custody of the cargo during such period, are important only if a managing officer or agent of carrier had knowledge of any of the aforesaid acts of neglect in the custody and care occurring up to and including the completion of the loading at number one hatch.

Insofar as the facts in this case are concerned the knowledge must have been that of Captain Amora and/or Mr. Gregorio Concon, President of carrier and Executive Vice President of the corporate managing agent of the vessel, and if the former the Court must also find that he was acting in a managerial capacity when he acquired such knowledge.

Without going into a detailed discussion and analysis of the evidence the Court believes, after considering all of the circumstances, including all permissible inferences, that the answer must be affirmative as to both.

■ First of all, the Court finds that Captain Amora was in fact the Port Captain of carrier with sufficient managerial authority to make his knowledge that of the owner.

The only evidence with respect to Captain Amora comes from Captain Farrales, whose conduct throughout has been that of a man who has something to hide. His belated second deposition attempt to downgrade the importance of Captain Amora convinces me that Amora was in fact an official of responsible stature in a managerial capacity.

The alteration of the log book entries for October 4th are matters to which the Court attaches considerable significance. The meaning of EVP for which libelant contends is accepted, but the Court thinks the entire entry has greater significance than libelant contends. It means that Gregorio Concon, Executive Vice President and company came aboard the vessel at 1300 on October 4th, 1964. The Court is satisfied from the entry immediately following that the character appearing between EVP and Co. is an ampersand. An examination of the crew list appearing in the front of the log book will demonstrate that the entry at 1430 is properly interpreted as "Posing (machinist) and Alcabaza (carpenter) reported for duty." The fact that the Executive Vice President came aboard the vessel during the afternoon of October 4th at Davao may not have been of particular significance. However, the conclusion is inescapable that someone in the employ of carrier knowing the purpose of Concon's visit and of the existence of this lawsuit attemped to disguise the real purpose thereof. No explanation has been offered for the change in the log book and in such circumstances the Court is entitled to infer, and does infer, that Concon was aboard the vessel for a purpose which, if known, would establish carrier's liability. Carrier says "to inquire about provisions would be a most natural inquiry by Concon." Perhaps true, but in the absence of an explanation the Court is not persuaded that the Executive Vice President and possibly others would travel from Manila to Davao, a distance of approximately 500 air miles, for the purpose of inquiring about provisions. As the late Judge Learned Hand said in Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 102 F.2d 450, 453 (2d Cir. 1939):

"* * * the condition of the log and the unsatisfactory explanation of it, coupled with the testimony of those who freshly examined it, are enough; we cannot avoid the conclusion that it had been dressed up to excuse the ship's faults. That goes much further than merely to discredit the document itself; it is positive evidence upon the very issue, and weighty evidence as well. Wigmore § 278. When a party is once found to be fabricating, or suppressing, documents, the natural, indeed the inevitable, conclusion is that he has something to conceal, and is conscious of guilt."

■ Why carrier did not take the testimony of Captain Amora and Mr. Gregorio Concon is best known to carrier. They were certainly important witnesses in connection with carrier's liability. Such testimony would seem to be readily available to carrier and in the absence thereof or a reasonable explanation as to why it was not taken the Court can and does infer that it would have been unfavorable. O. F. Shearer & Sons v. Cincinnati Marine Service, Inc., 279 F.2d 68, 73 (6th Cir. 1960); Coyle Lines v. United States, 195 F.2d 737 (5th Cir. 1952).

Libelant shall prepare Findings of Fact, Conclusions of Law and Interlocutory Decree in accordance herewith for presentation to the Court after five days' notice to carrier.