Ruth MONTGOMERY, etc., et al.,
Appellants,

v.

GOODYEAR AIRCRAFT CORPORA-
TION, Appellee. (Two other cases)
Nos. 300–302, Dockets 31770–31772.

United States Court of Appeals
Second Circuit.

Argued Feb. 21, 1968.

Decided April 10, 1968.

See, also, D.C., 231 F.Supp. 447.

**778**

Murray L. Lewis, New York City (Harry H. Lipsig, Joseph B. Castleman and Richard S. Perles, New York City, on the brief), for appellants.

Paul W. Williams, New York City (William A. Runyan, Akron, Ohio, Robert F. Martin, Stephen R. Tisa, and Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, on the brief), for appellee.

Before FRIENDLY and SMITH, Circuit Judges, and GIGNOUX, District Judge.*

J. JOSEPH SMITH, Circuit Judge:

On July 6, 1960, at 2:30 p. m., the U. S. Navy airship Reliance, ZPG 3W, BuNo 144242, a non-rigid two-engined aircraft some 403 feet long, inflated with about 1,500,000 cubic feet of helium, crashed into the ocean off the coast of New Jersey. Eighteen servicemen out of a crew totaling twenty-one were killed or died after the crash. The personal representatives of eleven of the decedents brought libels, consolidated below, based on the Death on the High Seas Act and general maritime law against Goodyear Tire and Rubber Company, manufacturer of the fabric used in the airship envelope, Goodyear Aircraft Corporation, manufacturer of the airship, and Edwards Company, Inc., manufacturer of a low pressure warning bell used in the airship. Judge Irving Ben Cooper, in the District Court for the Southern District of New York, dismissed the claims against Goodyear Tire and Edwards at the conclusion of appellants' direct case and, after trial, entered judgment in favor of respondents, holding that the libelants had failed to sustain their burden of proof as to Goodyear Aircraft. We find no error and affirm the judgment.

No question is raised as to the judgment in favor of Goodyear Tire and Rubber and in favor of Edwards. Appellants attack only the exoneration of Goodyear Aircraft.[1]

Since this was a non-rigid airship, the shape of the envelope depended on sufficient gas pressure. The envelope was filled with helium normally at sufficient pressure to keep the envelope taut, and to provide static lift nearly equal to the weight of the envelope, engines, radome, radar equipment, car, fuel, crew and accessories. The ship was maintained in flight by the addition of the dynamic lift of the outside air over the envelope acting as an air foil when the ship was driven ahead by one or both engines. Pressure in the envelope was subject to variation from a number of causes, altitude, superheat from the sun on the envelope, small leaks of helium, and others. A decrease in altitude caused lowering of pressure. Within the main envelope were four ballonets, which could be inflated with air to reduce the volume of helium and increase its pressure on the envelope. Tanks of fuel and ballast

---

* Of the District Court of Maine, sitting by designation.

1. While the United States is not a formal party to the action, it is undisputed that its contract with Goodyear binds the United States to indemnify Goodyear for any recovery against Goodyear as well as the expense of defending against the libels.

could be jettisoned to lighten ship and cause it to rise.

Appellants claimed that the crash had been caused by a tear in the envelope of the airship which resulted from Goodyear Aircraft's failure properly to bond one of the envelope seams. The tear in question was found after salvage in the fabric of the envelope. It extended for about 133 feet in a relatively straight line topside aft from the nose of the ship along beside the topmost longitudinal seam, interrupted by a three to four foot opening of the seam itself, and then along next to the seam again, to the radome, a structure on the top of the ship housing radar equipment. It is appellants' contention that the tear began at the opening in the seam, and extended from the opening forward to the nose and aft to the radome. Goodyear claims that the crash was caused by changes in air pressure within the envelope which were not properly corrected for by the pilot and crew. It argues that the tear in question resulted upon the airship's crashing into the water, not while it was in the air. Libelants' case is based on the contention that the seam was improperly made and that it failed in flight causing the 133 foot tear, agreed to have been a high-speed tear.

The court found that libelants "failed to convincingly establish that the air-

ship burst open in the air," and that they failed to prove that any manufacturing defect was the cause of the accident. It did not reach the questions raised by respondents' pleadings of whether a manufacturer acting under a military weapons system development contract may be liable either in negligence or strict liability to persons injured as a result of defects in manufacture, or whether the government contract of indemnity precludes recovery for injury or death of service personnel under the theory of Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Since we uphold the court's determination that the libelants have failed to carry the burden of persuasion on the essential facts of causation, we likewise do not reach the questions sought to be raised by the special defenses.[2]

Although we could wish that the proof were more convincing here as to the true cause of the crash, we cannot say that the court was bound to accept libelants' version. The basis of the determination appears from the court's opinion.[3] The evidence as to what happened in the period just before the crash was conflicting, particularly in two respects essential to the support of libelants' theory, the time element between the onset of trouble and the impact with the ocean, and the degree of inflation of the envelope when

2. We express no opinion on the asserted defense of governmental immunity under the doctrine of Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Compare Weyerhaeuser SS Co. v. United States, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963); Ryan Stevedoring Co. v. Pan-Atlantic Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Weyerhaeuser SS Co. v. Nacirema Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958); Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959), and Waterman S. S. Co. v. Dugan & McNamara, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960).

Nor do we reach the question of whether the fact that the envelope was manufactured under government contract and pursuant to government specifications in any way insulates the manu-

facturer from liability, compare Boeing Airplane Company v. Brown, 291 F.2d 310 (9 Cir. 1961).

3. It would be more helpful to us on review, however, and would give us greater certainty that the result was correct and reached after careful and thoughtful consideration of all factors, if detailed findings and conclusions were reached by the judge himself rather than wholesale adoption of those submitted by counsel. See Matton Oil Transfer v. The Dynamic, 123 F.2d 999 (2 Cir. 1941). F.R.Civ.P. 52(a), 5 Moore, Fed. Practice ¶ 52.03, p. 2632: "The purpose of findings of fact and conclusions of law is to aid the trial court in making a correct factual decision and a reasoned application of the law to the facts; to define for purpose of *res judicata* and estoppel by judgment the issues then adjudicated; and to aid the appellate court."

the ship was first in difficulty. The airship had an air sea rescue assignment to search for the yacht Vat 69 reported missing at sea. The airship left Lakehurst on the mission about 7:00 a.m. July 6. An officer aboard was to be checked out on his qualifications for patrol aircraft commander. The yacht was reported found about 1:00 p.m., and the airship turned to training maneuvers in the area of Barnegat Lightship off the New Jersey coast. It maneuvered in this area until it crashed in the sea, nose first, about 2:30 p.m.

Respondents appear to advance a theory that the crash was caused by pilot or crew error in one of two respects, both quite speculative in foundation. One was that the pilot and the officer being checked out were at the controls, and that the pilot put the ship into some maneuver to test the officer's ability to respond with proper corrective action, that the ship went into too steep a dive, throwing both against the controls and preventing prompt enough corrective action. (On salvage both seat belts were found unbuckled.)

The other theory was that the circuit breakers for the electrical equipment which governed the supply of air to the ballonets were pulled out to the off position by error, making it impossible to correct for loss of pressure. On salvage these two circuit breakers, as well as three immediately above them controlling current to the radar system, were found in the out position, in which the circuits were broken. There was evidence from two of the survivors, Culligan, the senior electrician, and Contreras, that Contreras, one of the junior electricians, some time previous to the crash had awakened Culligan, reported a lack of pressure in the radar system and inquired as to the location of the circuit breakers controlling the radar. Contreras testified that he checked the circuit breakers and all were on except those of some heaters which were inoperative during the hot weather. He thought a radar man also checked the circuit breakers. R. 194–197. A great majority of the circuit breakers on the electrical panels were found in the on position when salvaged. The significance of those found in the off position is in dispute, since a short in the system throwing the circuit breaker to the off position would be caused if any exposed part of the particular circuit entered the water while power was still being supplied to the circuit. Thus neither of respondents' theories provides a satisfactory solution to the question of what was the immediate cause of the crash. Both depend to a considerable degree on conjecture. Appellants' version however, suffers from a like weakness.

The testimony of the three survivors, of whom Culligan testified and the depositions of Saumier and Contreras were read, and the opinions of Vincelli, a Navy employe who examined the envelope after salvage, and Hiering, another Navy employe who ran fabric tests, if credited, lend some support to appellants' claim of a seam opening in flight. Culligan testified before the Navy Board that he went back to sleep after talking with Contreras, and saw daylight coming from the astrodome when he next awakened in his bunk. The judge credited his statement at trial, R. 39–40, that he saw daylight, which meant that the envelope had opened. He concluded, however, that Culligan was mistaken in thinking that this was before impact with the water. The record, Ex. A, Resp.App. 2906–14, supports this conclusion of the judge, for Culligan recalled that he was waiting for impact when he saw the light, but that impact never came, an indication that impact had already occurred before Culligan was fully awake, and that it may have been before Culligan saw the light. Contreras and Saumier heard a blowout or burst, or loud crash followed by a nose dive. While this might well have been taken to indicate that the envelope had in fact burst in flight (as had been the Navy Engineering Group's opinion, see Ex. 13, Resp.App. 2919–2923), it is possible that the noises came from cables or structures giving way after the ship had been distorted in shape, with sagging of the envelope, and Vincelli, on

whose investigation the Navy's opinion was based, had testified, R. 303, that his opinion that the tear occurred in flight required a taut condition of the envelope, with no sagging, when the tear occurred. That the envelope was distorted, banana or hot dog shape, wrinkled, folded or creased before it dove and that there was then no topside tear, is supported by testimony of eyewitnesses on fishing boats and a plane nearby at the time of the crash. The time estimates varied widely. See Weeks, R. 588–9, Lockie, R. 621–3, Keppler, R. 662–673, Murphy, R. 683–797, Lopusznski, R. 805 (normally inflated), Conte, R. 914–934, Schleifer, R. 1737.[4]

It may be that these witnesses' testimony was incorrect in some degree, from inaccuracy of observation, faulty memory, or otherwise. In some respects it is quite likely that it was. Several be-

4. The following condensation of the testimony illustrates the considerable variation in the testimony of the eyewitnesses. Boyd, Conte, Eble, Edwards, Keppler, Lockie, Palumbo, Schleifer, Sellinger and Weeks saw the crash from fishing boats in the area. Commander Murphy and Lopusznski from a Navy airplane flying above the blimp.

*Edwards*—The front part of the bag was limp before it hit. R. 496, 557.

*Weeks*—Banana or hot dog shape. R. 588. 13–15 seconds. R. 589. Twisted some—still maintained its gas, both ends. R. 596–7.

*Lockie*—Noticed a few ripples top section forward. R. 621. Descending—as it was coming down, nearing the surface nosed up slightly at about 15 or 20 degree angle. R. 623. ¾ minute—minute and ½. R. 644.

*Keppler*—Crack or tear starting at the top, vertically to directly above forward edge of gondola. R. 652–3. Tear slowly, not swiftly—five seconds. R. 658. Now knows there was no tear there. R. 659. Noticed it minute and ½—2 minutes before crash. R. 660a.
Could have been a shadow or a wrinkle. R. 665. Minute and ½ after Keppler told Weeks it was in trouble. R. 667.
Ship reversed position from downward angle to upward angle. R. 672, 673.

*Commander Murphy*—Fold or crease across the top—banana shape momentarily—dove into water. R. 683. No holes. R. 683. 15 seconds—2 or 3 seconds in the dive. Dove from about 700 ft.—2 or 3 seconds. R. 773. Nose drooped before it went in—no ripping or tearing. R. 797.

*Lopusznski*—Normally inflated, as if it had flown into the water. R. 805.

*Conte*—Banana shape—wrinkles. R. 914–5. Came down slow. 2 or 3 minutes. R. 933–4.

*Boyd*—400–600 ft. up midship section collapsed above the gondola area. R. 1725.
Fragmented wavering pieces of fragment. R. 1726. 6 or 8 seconds to hit the water. R. 1726.

*Schleifer*—Nose up, but coming down. R. 1737.
"Looked like someone took a fist and run it into the nose of the ship"—continued straight down. R. 1737. Nose up trying to climb 15 to 20 minutes. R. 1743.

*Saumier*—It wasn't straight down. R. 1790.
They were yelling—somebody yelled "we're going in." R. 1792.
Braced himself—took long. R. 1793.
Flying along big bang, boom, then snapping and cracking. R. 1803.

*Eble*—Little sag in the top—came straight down—long streamers—black strips—black and white ribbons. (No nose left when it hit the water—all had ripped apart in ribbons and was flying back over the tail end of the plane.) R. 1838–9.

*Sellinger*—800 ft. to sea level in 8 to 10 seconds. R. 1893. (He had earlier said a couple of minutes. R. 1900) (He was partial to the widows. R. 1906) (On deposition he had said "started to slowly nose down" and 2½ minutes). R. 1917–8, 2½, 3 minutes. R. 1947. In a Navy interview in 1960 he did say 8 seconds. R. 1956.

*Palumbo*—Coming down on an even keel. R. 2628.
Saw torn fabric before it hit the water. R. 2638. But see R. 2642–5 and 2649.

**782**

lieved the ship was operating at the time of the crash only one of its two propulsion engines, with the propeller of the other feathered. The testimony of the survivor Contreras, R. 190, however, makes it quite plain that the second engine had been started up shortly before the crash, whereupon the auxiliary power unit, not needed when both main generators were running, had been shut down and was being serviced. The judge was not required, however, either by the quite natural variations in the eyewitness' testimony, or such inaccuracy as the apparent one concerning the second engine, to reject all the observations which pointed toward a loss of pressure prior to the crash and prior to the tear. We have no definite and firm conviction that he was in error in finding a loss of pressure in flight, causing distortion of the envelope to a banana shape and causing the loss of elevation without bursting of the envelope.

The court's factual determinations, reached after trial involving the credibility of witnesses, many of whom testified in person, may be reversed only if a reviewing court has a definite and firm conviction that an error has been made. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Guzman v. Ruiz Pichirilo, 369 U.S. 698, 702, 82 S. Ct. 176, 7 L.Ed.2d 92 (1962); Roman Products Corp. v. DiCrasto Dairy & Food Products, Inc., 361 F.2d 599 (2 Cir. 1966). F.R.Civ.P. 52(a). We find no such basis for reversal here.

The remaining claims on appeal have little substance.

Appellants contend that the judge pre-determined the case. A review of the entire record fails to bear out any such claim. The judge's expressed satisfaction when witnesses were produced who hopefully could shed some light on the probable causes of the tragedy is far from a showing of bias or preference for one side or the other.

Appellants contend that the exclusion of a photostatic copy of an IBM card, Ex. 29 for identification found in Goodyear's files, was prejudicial error. The card purported to show a conclusion in some Naval record that the accident was caused by failure of the seam in flight. The card, however, appears to have been insufficiently identified as to source, and even if admissible, its exclusion was harmless error in view of Vincelli's testimony as to his conduct of the Navy envelope investigation, the opinion formed and the basis for it. It appears from the colloquy, R. 740, that the Navy was unwilling to produce its accident report, but it also appears, R. 741, that all the testimony and exhibits before the Navy Board were made available to counsel.

We have considered the other claims of error in the admission and exclusion of evidence and find them without basis.

Judgment affirmed.