460 F.2d 89
 In the Matter of the Vessel MARINE SULPHUR QUEEN.
Marine Sulphur Transport Corporation, As Owner, Appellant,
and Marine Transport Lines, Inc., As Demise
Charterer, Appellant,
Bethlehem Steel Corporation, Impleaded Respondent-Appellant,
United States Fire Insurance Co., Cargo Claimant-Appellee
and Appellant,
Ida Ruth Heard et al., Death Claimants-Appellees and Appellants.
 Nos. 457-460, Dockets 35228, 35233, 35235 and 35247.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 26, 1972.
Decided April 25, 1972.
 
 John A. Sullivan, New York City (Cadwalader, Wickersham & Taft, William S. Busch, and Fred R. Profeta, Jr., New York City, on the brief), for appellants Marine Sulphur Transport Corp. and Marine Transport Lines, Inc.
 Harold R. Medina, Jr., New York City (Cravath, Swaine & Moore, Ralph L. McAfee, David S. Cupps, Arnold P. Messing, and Ronald E. Guttman, New York City, on the brief), for impleaded respondent-appellant Bethlehem Steel Corp.
 Douglas A. Jacobsen, New York City (Bigham, Englar, Jones & Houston, and Joseph J. Magrath, 3rd, New York City, on the brief), for cargo claimant-appellee and appellant, United States Fire Ins. Co.
 Donald E. Klein, New York City, and George J. Duffy, Hoboken, N. J. (Herbert J. DeVarco, Chairman, Proctors Committee, Samuel Ackerman, New York City, Nathan Baker, Hoboken, N. J., Burton M. Epstein, Douglas A. Jacobsen, Herbert Lebovici, Thomas McElligott, Ned R. Phillips, Enrico S. S. Sanfilippo, and Jack Weinberger, New York City, on the brief), for death claimants-appellees and appellants.
 Seward & Kissel, Eugene P. Souther, Martin C. Seham, New York City, Alfred E. May, and Edward P. Ruddy, Washington, D. C., on the brief for The American Institute of Merchant Shipping, American Maritime Ass'n and Shipbuilders Council of America, on the brief, amici curiae.
 Before FRIENDLY, Chief Judge, ANDERSON, Circuit Judge, and BONSAL, District Judge.*
 ANDERSON, Circuit Judge:
 
 
 1
 The Marine Sulphur Queen (the Queen), a converted T-2 tanker laden with a cargo of molten sulphur, left a pier at Beaumont, Texas, with pilot aboard at 1330 C.S.T. on February 2, 1963. At 1900 the pilot was dropped at Sabine Bar Seabuoy and the vessel continued on her course for Norfolk, Virginia, with her estimated time of arrival at noon E.S.T. on February 7th. At 0125 E.S.T. on February 4th a personal message from a crew member was received by R.C.A. This was the last word heard from the ship or from anyone one on her. Thereafter at 1123 an attempt was made to contact the Queen by R.C.A. radio but there was no response. At that time, had all gone well, the vessel's estimated position would have been roughly 100 nautical miles, on a bearing about West by South, from Key West, Florida. No radio distress message was ever received.
 
 
 2
 For the next nine days extensive air and surface searches were conducted for the vessel and her personnel. Nothing was found which could be identified with the vessel. Thereafter a second search was instituted and there were discovered eight life jackets, five life rings, two name boards, a shirt, a piece of an oar, a storm oil can, a gasoline can, a cone buoy and a foghorn, all of which were marked or identified as belonging to the lost vessel.
 
 
 3
 There was oil on some of the life jackets and life rings, but there were no traces of sulphur on any of the items; nor was there discovered any splintered or scorched debris or other evidence of fire or explosion. An underwater exploration was made by the Navy for the vessel's hulk, but without avail. Concentrated search operations were terminated on March 13.
 
 
 4
 After a thorough inquiry by a Marine Board of Investigation, convened by the Commandant of the United States Coast Guard, into all the circumstances of the ship's disappearance, it was concluded by the Board and the Commandant that, for an unknown and unascertainable cause, the Queen had gone to the bottom with the cargo, and the entire ship's company of 39 had been lost.
 
 
 5
 Claims were made by the representatives of the deceased crew members (Death Claimants) based upon the general maritime law relating to unseaworthiness of a vessel, under the Jones Act, 46 U.S.C. Sec. 688, and under Death on the High Seas Act, 46 U.S.C. Sec. 761 et seq., and also by United States Fire Insurance Company (F.I.C.), based upon the Carriage of Goods by Sea Act, 46 U.S.C. Sec. 1300 et seq. (COGSA), as insurer of the cargo shipped by Texas Gulf Sulphur Co., to whose claim F.I.C. was subrogated. Marine Sulphur Transport Corporation (MSTC), as shipowner, and Marine Transport Lines, Inc. (MTL), as demise charterer, petitioned for exoneration or limitation of liability pursuant to 46 U.S.C. Sec. 183 et seq. Later Bethlehem Steel Co. (Bethlehem), as the shipbuilder, and Texas Gulf Sulphur Co. (TGS) were impleaded as respondents.
 
 
 6
 At the trial voluminous evidence was presented covering the circumstances surrounding the acquisition of the Queen by MSTC, the arrangements for her conversion from a former oil tanker to a carrier of molten sulphur, the nature and details of the conversion, extensive expert testimony as to the effect of the structural changes on the operational condition of the ship as a molten sulphur carrier, the characteristics and hazards of the cargo and the history of the ship prior to the fatal voyage, including her 63 round-trip voyages as a molten sulphur carrier between January 18, 1961, when the Queen was certified by the Coast Guard for the carriage of Grade E liquids at elevated temperatures, and February 1, 1963, when she commenced taking on cargo for what proved to be her last voyage. There was evidence as to the quantity of this cargo and its stowage. The testimony also included statements by experts as to the possible causes for the loss of the vessel, cargo and crew. All of these elements of the case are described and discussed in the opinion of the district court, 312 F.Supp. 1081 (S.D.N.Y.1970). For the purpose of this review a summary will suffice.
 
 
 7
 In April, 1960, TGS was desirous of making long term arrangements for the transportation of its molten sulphur. As a result of negotiations with MTL, the latter agreed to cause its wholly owned subsidiary MSTC to purchase a 17 year old, T-2 oil tanker, Esso New Haven, to be converted into a molten sulphur carrier by Bethlehem at its Baltimore shipyard, in accordance with a contract, including plans and specifications, agreed upon by MTL and Bethlehem and approved by TGS. Charter parties were agreed upon in advance between MSTC, as shipowner, with MTL, demise charterer, and between MTL and TGS, as time charterer, for consecutive voyages for 12 charter years, commencing when the vessel was ready to load. Fundamental to this accord were MTL requirements that the cost of the conversion not exceed $1,650,000 and that the converted ship have a minimum cargo capacity of 15,100 long tons.
 
 
 8
 In due course the T-2 oil tanker was purchased and was delivered to the Bethlehem shipyard where her conversion went forward. The plans contemplated that the cargo, a minimum of 15,100 long tons of molten sulphur at 265~ to 275~F., would be carried in a large tank in the hold of the vessel. This tank was 306' long, 30'6" wide and 33' high, having a rectangular cross section. It had three internal sulphur-tight bulkheads which divided the tank into four sub-tanks. The Queen herself was an all welded T-2-SE-A1 tankship of 7,240 gross tons and 4,057 net tons, with a length of 504', beam of 68.2' and a depth of 39.2'. In order to accommodate the 306' cargo tank it was necessary to remove the greater part of nine transverse bulkheads, i. e. those at frames 47 and 71 and the seven in between. It was also necessary to lower the floor of the ship which cut the transverse web frames down to 3'4" above the flat keel plate. The center vertical keel was reduced to less than half its original height and the deck centerline girder was cut down slightly less than half its depth. The American Bureau of Shipping and the Coast Guard were not persuaded that the original conversion plan afforded sufficient transverse strength to the vessel and they required that a full transverse bulkhead be included at frame 59, which was the center of the cargo tank and mid-ships of the Queen, and also ordered that provision be made for other strengthening factors. The loss of transverse strength from removal or reduction of the transverse bulkheads was sought to be compensated for by strategically placed whole or partial diaphragm bulkheads, the addition of substantial flange plates, transverse web frames at the bottom of the vessel and at the top, beneath the deck, and by welding the cargo tank from frame 58 to 60 to the five longitudinal girders of the ship which were under the cargo tank.
 
 
 9
 To allow for longitudinal expansion due to the intense heat of the cargo there were five longitudinal stringers attached to the bottom of the cargo tank to which were fitted flange plates which were bolted to the flange plates affixed to the ship's five longitudinal members. Between the flange plates there was inserted Phenolite, a laminated plastic, as a heat insulator. There were slots 3 1/2" to 4" long in the insulation and in the flanges attached to the ship's longitudinals to allow for movement of the bolts. Likewise, above the tank there were slotted bolt connections with the centerline deck girder.
 
 
 10
 There were spaces on both sides of the length of the cargo tank which were approximately 15' in width between the sides of the tank and the sides of the ship. This area was partly taken up by wing tanks which were used for fuel, water or ballast, or left empty and the remainder, except for internal frame structures, gear and appurtenances, constituted the voids. The cargo tank was covered with a blanket of Owens-Corning Armaglas insulation which was 6" thick on top and 4" thick elsewhere. At the after ends of each of the four sub-tanks within the cargo tank there were port and starboard expansion trunks which extended up through the weather deck into weathertight pumphouses.
 
 
 11
 From each of the sub-tanks there was at the forward center a stream jacketed 6"' vent, which extended up through and about 3' above the weather deck and ended in a U-bend. Also from each of the expansion trunks there was a steam jacketed 4" vent which ran through the top of the pumphouse and terminated about 2' above it in a U-bend. These were designed to carry off the hydrogen sulphide and carbon disulphide from the surface of the molten sulphur.
 
 
 12
 The Queen's Trim and Stability Booklet, approved by the Coast Guard, gave her optimum cargo capacity as 15,211 long tons. The district court found that on the voyage in question, though the ship's waterline was, on departure, below her Plimsoll mark, she carried 15,315 long tons of molten sulphur which completely filled her cargo tanks and overflowed into the expansion trunks. The court held that this overfilling of the cargo tanks was, under the circumstances, improper and dangerous. The 15,315 long tons figure was taken from the bill of lading and the weight certificate, and it was also the amount of the cargo claim for which the insurance company paid to TGS after the loss. MTL and MSTC argued that the correct figure was 15,260 long tons which the Coast Guard Board had assumed to be the cargo tonnage.
 
 
 13
 After the Queen was lost the United States Navy Oceanographic Office prepared a report on the weather which had prevailed between 2000 E.S.T. on February 3, 1963 to 1300 E.S.T. on February 4, for the waters lying between 80~ W. and 82~ W. There were generally northerly winds at a maximum of 25 knots with gusts to 46 knots. The maximum height of the waves was 16.5'. Because the entire weight of the cargo was confined to an area 30' wide and centered over the keel rather than across the whole 68.2' width of the vessel's hull, the radius of gyration of the ship was reduced; in other words, the arc of its roll was substantially shortened as compared with another vessel with the same metacentric height. The period of roll of the Queen was 8.5 seconds and, according to the Oceanographic Office report, the timing of the succession of waves was within 10% of the vessel's roll time.
 
 
 14
 The district court concluded that when the Queen left Beaumont, Texas, on her last voyage she was unseaworthy in several respects and "not reasonably suitable for her intended service." The court found the vessel as converted violated "the hundred-foot rule", Sec. 12(2), of the ABS "Rules for Building and Classing Steel Vessels," which were adopted as official regulations by the Coast Guard, 46 C.F.R. Sec. 31.10-1, and promulgated pursuant to 46 U.S.C. Sec. 391a(2), in that she was constructed with transverse bulkheads more than 100' apart and MSTC and MTL were thus liable for statutory fault.
 
 
 15
 It also concluded that the conversion resulted in a substantial weakening of the transverse strength of the vessel, which was not made up for or replaced by the newly added diaphragm bulkheads, the fastenings of the cargo tank, the tank itself and the other internal structures, to the extent that the Queen was unable to cope with the racking stresses caused by the heavy seas on February 3 and 4, 1963 and that she could well have suffered a sudden and massive structural collapse.
 
 
 16
 The court further held that the Queen was unseaworthy because there was no provision for transverse and vertical thermal expansion and the resulting stresses; and because the center line concentration of the cargo weight reduced the ship's radius of gyration and her period of roll was faster than that of another vessel with the same metacentric height. She was also unseaworthy because the shear stress on the bottom transverse web frames tended to be increased; because corrosive (and conceivably explosive) pieces and particles of sulphur coated most of the interior of the vessel surrounding the cargo tank; because there was no adequate system for warning the crew of the toxic and potentially explosive mixtures of hydrogen sulphide and carbon disulphide in the cargo tank and in the void spaces where there had been a history of frequent fires; and because the vents for carrying off these gases from the surface of the molten sulphur were ineffective due to the over-filling of the cargo sub-tanks and the overflow into the expansion trunks. As noted above, the court also found that the vessel was dangerously loaded.
 
 
 17
 The district court denied the petitions of MSTC and MTL for exoneration or limitation of liability; it granted recovery to the Death Claimants against MSTC, MTL and Bethlehem but denied them the recovery of punitive damages. It dismissed their claim against TGS and TGS's petition for exoneration or limitation-rulings which were not appealed. It granted F.I.C., as cargo claimant, recovery against MSTC and MTL but dismissed its claim against Bethlehem.
 
 
 18
 Although the Death Claimants invoked and the district court decided their claims on the authority of both the Jones Act and unseaworthiness, it is wholly unnecessary to consider the applicability of the Jones Act in this case where all of the decedents were lost in the line of duty on a ship at sea. Unseaworthiness as a basis for their claims against MSTC and MTL amply covers all conceivable interests of the claimants and the Jones Act can add nothing; any rights of the Death Claimants which are based upon negligence are subsumed by the recognition of their claim of liability without fault which flows from their showing unseaworthiness-subject, of course, to the issue of causation, which we discuss infra. G. Gilmore & C. Black, The Law of Admiralty, Sec. 6-25, at 295; Sec. 6-38, at 315-317 (1957).
 
 
 19
 The concept, design, conversion and operation of the Marine Sulphur Queen was an experiment in the interests of developing a new and more efficient means of delivering molten sulphur by sea. She was the first vessel of her kind. As an experiment there were new and relatively untried features in her construction which in the opinion of the experienced and capable shipbuilders and certifying officials should theoretically have produced a seaworthy ship. The ship's handling and carriage of molten sulphur were governed by instructions from the highly experienced shipper, and 63 successful voyages had been completed under a galaxy of varying conditions without serious loss. Yet the frequent fires in the cargo tank insulation and in the voids, the spillage of molten sulphur into the ship's bilge, the nature and characteristics of the gases, their potential for danger from toxicity and explosion, and the means of venting them out of the closed areas of the ship were not fully explained or understood. The owner, however, did not consider these problems to be dangerous or unmanageable, but, as indicated below, we accept the lower court's findings that the vessel was unseaworthy in several respects.
 
 
 20
 A Coast Guard naval engineer testified that the design and conversion of the Queen for the carrying of molten sulphur "was a calculated risk." It was largely the owner's experiment, to which the officers and men of the ship had been committed.
 
 
 21
 There was an abundance of evidence, as detailed above, covering the entire history of the Queen from the plans for her acquisition and conversion through her actual operation as a molten sulphur carrier. This basic factual material furnished the grist for the central contention in the case carried on through the testimony of experts who were, on the one side, of the opinion that the ship was sound and seaworthy in all respects and those who, on the other side, were of the opinion that the vessel, as reconstructed and loaded at the time of her departure, was dangerous to the life and limb of the ship's company for several different reasons and was, therefore, unseaworthy. The district court concluded that the latter were correct and that the ship was unseaworthy in the several respects previously mentioned.
 
 
 22
 Although findings as to unseaworthiness and negligence are not, in this circuit, protected by the "unless clearly erroneous" test of F.R.Civ.P. 52(a), Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776-778 (2 Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966), such findings are entitled to great weight and will ordinarily stand unless the lower court manifests an incorrect conception of the applicable law. Cleary v. United States Lines Co., 411 F.2d 1009 (2 Cir. 1969). We can see no reason to disturb the lower court's findings of unseaworthiness.
 
 
 23
 The wrongful death claimants therefore sustained their burden of proving unseaworthiness and there remained only the issue of whether or not one or more of the conditions of unseaworthiness or some other agency caused the disaster. The court found in explicit terms that "no one knows how the ship was lost." The resolution of the question of liability will, under the circumstances, be determined by the allocation of the burden of proof on the causation issue, the existence of a rebuttable presumption and whether or not that presumption has been met.
 
 
 24
 Before discussing the matter of causation, mention must be made of the district court's holding that under the rule of The Pennsylvania, 19 Wall 125, 136, 86 U.S. 125, 136, 22 L.Ed. 148 (1874), the burden of proof rested on MSTC and MTL to show that the spacing of transverse bulkheads on the Queen more than 100' apart could not have caused the losses, because the failure so to space the bulkheads made them guilty of negligence as a matter of law. This finding of statutory fault rests on what the court considered the violation of a statutory standard embodied in the ABS "Rules for Building and Classing Steel Vessels" Sec. 12(2), supra, which required that "all vessels should have complete transverse bulkheads extending to the Strength Deck, spaced not over 100' apart.' The rest of Sec. 12(2), however, reads as follows:
 
 
 25
 ". . . This should be accomplished by the fitting of substantial transverse 'tween deck bulkheads immediately over the main watertight bulkheads. Where this is impracticable, the transverse strength and stiffness of the hull is to be effectively maintained by deep webs or partial bulkheads."
 
 
 26
 Section 12(1) immediately preceding Sec. 12(2) reads as follows:
 
 
 27
 "All vessels of ordinary type and normal form should be provided with strength and watertight bulkheads in accordance with this section; in vessels of special type where adherence to these rules is found to be impracticable, the arrangements will require to be specially approved."
 
 
 28
 It is obvious that the Queen was a "special type" vessel where strict and literal compliance with the provision for spacing transverse bulkheads 100' apart was "impracticable." The Coast Guard, as the appropriate and authorized administrative agency, could and did ratify the arrangements for strength bulkheads which the ABS had specially approved. Sections 12(1) and (2) expressly provided for such modifications and substitutions by the ABS. The interpretation and application of the rule by the ABS and the Coast Guard were not unreasonable, arbitrary or capricious and, therefore, the district court was not in a position to declare that particular courses of conduct on the part of MSTC and MTL, which the administrative agency had held to be in compliance with its interpretation of the rule, was negligence as a matter of law, see Udall v. Tallman, 380 U.S. 1, 4, 85 S.Ct. 792, 11 L.Ed.2d 616 (1965).
 
 
 29
 The district court was also in error in applying the rule of The Pennsylvania in this instance because the provisions in Sec. 12(1) and (2) do not delineate a precise and clearly defined duty, but rather call for interpretation and for judgment in their application, Afran Transport Co. v. United States, 435 F.2d 213, 219 (2 Cir. 1970), cert. denied 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971).
 
 
 30
 This is not to say, however, that a district court as a trier of fact is thereby barred from finding that the same acts or omissions have given rise to unseaworthiness in the vessel, Schlichter v. Port Arthur Towing Co., 288 F.2d 801, 804-805 (5 Cir.), cert. denied, 368 U.S. 828, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961).
 
 Death Claimants against Owners
 
 31
 In accordance with general tort principles a crew member seeking damages against his employer, the owner, either under the maritime doctrine of unseaworthiness or under the Jones Act, has the burden of proving that the ship was unseaworthy or the owner negligent and also that such unseaworthiness or negligence was in fact a cause of his injury. And, just as the mere fact that the injury to the claimant occurred on the ship does not, in itself, establish unseaworthiness, Mosley v. Cia. Mar. S. A., 314 F.2d 223, 229 (2 Cir.), cert. denied, 375 U.S. 829, 835, 84 S.Ct. 52, 11 L.Ed. 2d 65 (1963); Richter v. Mathiasen's Tanker Industries, Inc., 297 F.2d 494 (2 Cir. 1961), cert. denied, sub nom., Pinto v. States Marine Corp., 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962), neither does proof of the fact of unseaworthiness, ipso facto, provide the proof of causation, see, Grillea v. United States, 229 F.2d 687, 689, rev'd on other grounds, 232 F.2d 919 (2 Cir. 1956); Ramos v. Matson Navigation Co., 316 F.2d 128, 131 (9 Cir. 1963).
 
 
 32
 It is settled that when a vessel disappears in expectable weather under otherwise unknown circumstances, proof by the plaintiffs of some element of unseaworthiness will permit the trier of fact to infer that the unseaworthiness was the proximate cause of the loss. Walston v. Lambertsen, 349 F.2d 660, 662 (9 Cir. 1965), cert. denied, 382 U.S. 980, 86 S.Ct. 553, 15 L.Ed.2d 470 (1966) (dicta); Admiral Towing Co. v. Woolen, 290 F.2d 641, 649-651 (9 Cir. 1961); Roth v. Bird, 239 F.2d 257, 262 (5 Cir. 1956); The Cleveco, 154 F.2d 605, 615 (6 Cir. 1946). Although the lower court did not clearly state that it drew this inference of causation, we hold that its resolution of the liability of the owners to the Death Claimants subsumes such an inference. While the lower court may, to some extent, have relied on inappropriate authority for such an inference,[1] we see nothing in the lower court's opinion inconsistent with the conclusion that it drew the inference that the several aspects of unseaworthiness were, in their totality, the proximate cause of the Queen's disappearance, cf. Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800, 813 (2 Cir. 1971).
 
 
 33
 While most of the cases cited above which sanction the drawing of an inference of causation generally involve only one aspect of unseaworthiness, e. g., Roth v. Bird, supra, 239 F.2d at 262, we do not read them as prohibiting a similar inference when, as here, there are several aspects of unseaworthiness for all of which the defendant is responsible; to do so would produce an unjust and illogical result. It would deny the plaintiff who was able to prove that a vessel was unseaworthy in several respects an inference that would have been available to him had he only proved one aspect of unseaworthiness. Rather, as the list of unseaworthy aspects of the vessel grows longer, the inference becomes increasingly more reasonable that those aspects, as a group, were the proximate cause of the loss.
 
 
 34
 We read those cases permitting an inference of causation when an unseaworthy vessel disappears at sea in expectable weather but otherwise unknown circumstances as shifting the burden of production, but not the burden of persuasion, to the owners to demonstrate that the inference is unreasonable. Cf. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 110-113, 62 S.Ct. 156, 86 L.Ed. 89 (1941).
 
 
 35
 As we accept the district court's findings of unseaworthiness, and the initial inference of causation drawn therefrom, we need only reexamine the evidence produced by the owners in an attempt to cast doubt on the reasonableness of the inference. Putting aside such improbable theories of cause as meteors or lightning, the only rebutting causal evidence of any force was the weather conditions.
 
 
 36
 We agree with the trial court that the weather conditions at the time of the disappearance of the vessel were expectable. While there were strong winds and rough northerly seas during the early hours of February 4th, this was by no means extraordinary, nor did it represent a situation which a seaworthy ship could not have been reasonably expected to weather. As the District Court observed, some 24 ships reporting weather conditions for that date to the Weather Bureau, sailed through the disturbed areas without incident. Texas Gulf Sulphur No. 1, a smaller vessel converted to transport molten sulphur, was sailing high and light toward Houston along a course somewhat parallelling, in the opposite direction, the probable course of the Queen. Her master testified that he had sailed through such winds many times without suffering damage, and that the obviously desirable condition for experiencing such weather was when the vessel was laden [as was the case of the Queen] rather than when she was light. See, e. g., The Cleveco, supra, 154 F.2d at 615. An owner has a duty to provide a vessel that can withstand expectable weather, Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), and when a vessel goes down in such weather, a reasonable inference that proven aspects of unseaworthiness were the cause of the loss will stand. See, e. g., Sabine Towing Co. v. Brennan, 72 F.2d 490, 493-494 (5 Cir.), cert. denied, 293 U.S. 611, 55 S.Ct. 141, 79 L. Ed. 701 (1934).
 
 
 37
 MTL, as the demise charterer, is the owner pro hac vice with all the responsibilities to the crew otherwise placed upon the shipowner, see Bergan v. International Freighting Corp., 254 F.2d 231, 232 (2 Cir. 1958), and it is therefore liable as the owner here. On the other hand, an owner-demisor is generally only liable where the injury results from unseaworthiness or negligence which existed prior to the delivery of the vessel to the demise charterer. Cannella v. Lykes Bros. S. S. Co., 174 F.2d 794, 796 (2 Cir.), cert. denied, 338 U.S. 859, 70 S.Ct. 102, 94 L.Ed. 526, (1949). Where, as here, the court inferred proximate cause from several aspects of unseaworthiness, some occurring prior to delivery of the vessel to MTL and some occurring after the delivery, we might appear to be faced with an insoluble problem whether MSTC, as owner-demisor, can properly be held liable to the Death Claimants. However, on the peculiar facts of this case, we need not decide that interesting question. Where, as here, the owner-demisor is a wholly owned subsidiary of the charterer, the stock of which would clearly be available to satisfy the claims of the Death Claimants if MTL's other assets were insufficient, we see nothing which, as a practical matter, bars us from affirming liability as to MSTC. We emphasize that we do not decide whether in a case of unexplained disappearance where the owner-demisor is not a wholly owned subsidiary of the parent-demise charterer, the owner could properly be held liable when it was responsible for only some of a group of defects which, in their totality, were inferred to be the proximate cause of the loss.
 
 
 38
 In the absence of exoneration, MTL has petitioned for limitation of liability; however, in order to succeed, the burden is upon the owner to prove that the unseaworthiness was without its privity or knowledge, 46 U. S.C. Sec. 183(a); Petition of Long, 439 F. 2d 109, 113-114 (2 Cir. 1971); Moore-McCormack Lines, Inc. v. Armco Steel Corp., 272 F.2d 873, 876 (2 Cir. 1959), cert. denied, 362 U.S. 990, 80 S.Ct. 1079, 4 L.Ed.2d 1023 (1960); see also Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363 (1943). In light of the fact that no one knows what caused the loss, it is impossible for MTL to bear its burden, and, in addition, there was more than sufficient evidence to support the trial court's finding that MTL had failed in its task. In fact, MTL was in privity to all the elements of proven unseaworthiness because, through its highest officers, it was involved in and knowledgeable concerning the reconstruction of the ship, it knew the type of cargo that was being carried, and, through its master or agent, knew, or should have known, the condition of the vessel and how she was loaded prior to the commencement of her last voyage, see 46 U.S.C. Sec. 183(e). MTL need be in privity to only one of the several elements of unseaworthiness which it could not show had anything to do with causing the loss. Because MTL could show nothing at all about causation for the disappearance of the Queen and her crew, the district court properly denied it limitation.
 
 
 39
 MSTC also petitioned for limitation of liability but, as its liability derives from its position as a wholly owned subsidiary of MTL, it is unnecessary to comment further on the denial of MSTC's petition, except that it is clear MSTC had privity and knowledge as to those aspects of unseaworthiness inherent in the reconstruction of the vessel. MSTC was a party to the conversion contract, dated August 9, 1960, which incorporated by reference the conversion plans of the Queen.
 
 Death Claimants against Bethlehem
 
 40
 The Death Claimants argue that Bethlehem is also liable to them, because of the faulty design and reconstruction of the Queen. The shipbuilder, however, stands in a much different position vis-a-vis the lost seamen than the owner does, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 89, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The duty of providing the crew with a seaworthy ship runs only to the owner, and the ship-builder neither employs the crew nor can he control what happens to the ship once she leaves his yard. Therefore, traditional tort concepts apply to the claim against Bethlehem[2] and, contrary to the trial court's conclusion, neither justice nor logic compel the application against it of the permissible inference rule from the unseaworthiness doctrine.
 
 
 41
 Assuming, without deciding, that Bethlehem was at fault, either under a negligence theory or under the doctrine of a manufacturer's duty of strict liability, it could not be made liable to the claimants here unless its wrongful conduct was a cause of the loss, 2 F. Harper & F. James, The Law of Torts, Sec. 20.2, at 1110 (1956); see also, Montgomery v. Goodyear Aircraft Corp., 392 F.2d 777 (2 Cir.), cert. denied, 393 U.S. 841, 89 S.Ct. 121, 21 L. Ed.2d 112 (1968); McDaniel v. The M/S Lisholt, 282 F.2d 816, 818 (2 Cir. 1960), cert. denied, 365 U.S. 814, 81 S. Ct. 694, 5 L.Ed.2d 692 (1961). The burden of proving causation is on the plaintiff, see, e. g., Lamb v. Interstate S. S. Co., 149 F.2d 914, 916 (6 Cir. 1945), and causation must be established under the doctrine of strict liability, as well as under ordinary negligence, Basko v. Sterling Drug, Inc., 416 F.2d 417, 430-431 (2 Cir. 1969); see also, Restatement of the Law of Torts, Second, Sec. 402A, at 347-348 (1965).
 
 
 42
 The cause of the disaster which befell the Queen was found to be unknown. Of the possible causes considered, Bethlehem had no connection with those relating to the nature and handling of the cargo, such as corrosion and explosion. Because the Death Claimants have failed to prove that any fault on Bethlehem's part was a cause in fact of the loss, the claims against Bethlehem must be dismissed.
 
 Cargo Claimants
 
 43
 The rules of law, both statutory and judicial, relating to cargo claims are quite distinct from those relating to the death and injury of seamen; therefore the claims of F.I.C. against the owners stand on an entirely different footing from the claims discussed above. F.I.C. has been subrogated to the claims of the cargo owner, TGS, and thus has exactly the same remedies against MTL which TGS would have had.[3] As Judge Brown said in Isbell Enterprises Inc. v. Citizens Casualty Co., 431 F.2d 409, 417 (5 Cir. 1970), the subrogee insurance company "takes the Flotsam with the jetsam," see also, American Surety Co. v. Bethlehem Bank, 314 U.S. 314, 317, 62 S.Ct. 226, 86 L.Ed. 241 (1941).
 
 
 44
 Because no cause for the loss of the Queen has been found, the legal burden of proof rule determines the cargo issue, as it did with the Death Claimants. That rule for the private carriage of goods is explicated in Commercial Molasses Corp. v. New York Tank Barge Corp., supra, which applies here unless a statute or an agreement between the parties changed the normal burden.
 
 
 45
 Two statutes attempt, in various ways, to regulate the duties and liabilities of certain shippers and carriers, the Harter Act, 46 U.S.C. Sec. 190 et seq., and the Carriage of Goods by Sea Act, 46 U.S.C. Sec. 1300 et seq.; however, F.I.C. wisely makes no serious contention that either applies here of its own force. It has long been held that the Harter Act does not apply to private carriage, in which the Queen was engaged. Koppers Connecticut Coke Co. v. James McWilliams Blue Line, Inc., 89 F.2d 865, 866 (2 Cir.), cert. denied, 302 U.S. 706, 58 S.Ct. 25, 82 L.Ed. 545 (1937); The Westmoreland, 86 F.2d 96, 97 (2 Cir. 1936); The Fri, 154 F. 333, 338 (2 Cir. 1907), cert. denied, 210 U.S. 431, 28 S.Ct. 761, 52 L.Ed. 1135 (1908); The Monarch of Nassau, 155 F.2d 48 (5 Cir. 1946), and COGSA, which is concerned with bills of lading rather than charter parties, comes into play only in foreign commerce, in which, at the time of her loss, the Queen was not engaged, 46 U.S.C. Sec. 1300; see also, Gilmore and Black, supra, Sec. 3-25, at 126.
 
 
 46
 F.I.C. does argue, however, that TGS and MTL agreed to make COGSA, and its burden of proof rules, applicable to this private carriage, but, while they certainly could have made such an agreement, it is clear that they did not.
 
 
 47
 F.I.C. first contends that the charter party specifically incorporated COGSA in p1, p6, p23 and p28. These first three paragraphs, however, make no mention of COGSA whatsoever, but simply use the phrase that the owner "shall exercise due diligence" to keep the vessel in a seaworthy condition-language roughly paralleling that contained in Sec. 4(1) of COGSA, 46 U.S.C. Sec. 1304 (1). This mere similarity of rather common phrases does not invoke the entirety of COGSA, including its burden of proof rules, cf. Pannell v. United States Line Co., 263 F.2d 497, 498 (2 Cir.), cert. denied, 359 U.S. 1013, 79 S. Ct. 1151, 3 L.Ed.2d 1037 (1959).[4] While p28, captioned "Limitation of Liability" does provide that the owner shall have all "privileges, rights, and immunities as are contained in Sections 3(6), 4 and 11 of the Carriage of Goods by Sea Act," this too is not a general incorporation of COGSA, as the reference is limited to specific provisions of COGSA, favorable to the owner. When a statute is incorporated by reference, its terms become the terms of that part of the charter party, but limited incorporation does not trigger the entire Act, Pannell, supra, at 498; see also, J. Aron & Co. v. The Askvin, 267 F.2d 276 (2 Cir. 1959); The Westermoreland, supra, 86 F.2d at 97.
 
 
 48
 F.I.C. also puts great emphasis on the argument that the Bill of Lading incorporates COGSA and that its provisions must take precedence over the terms of the charter party. The bill of lading provided for in the charter party, and issued upon the receipt of the sulphur in the present case, however, incorporated COGSA only in certain limited circumstances.[5] Even if those circumstances had occurred COGSA would not regulate the terms of the contract of carriage between TGS and MTL.
 
 
 49
 A bill of lading may serve three functions: as a receipt, as a document of title, and as a contract for the carriage of goods; however, it does not perform this third function for the shipper and the carrier when there is a charter party containing the terms of the carriage contract. This point was made quite clear by this court in The Fri, supra, 154 F. at 337:
 
 
 50
 "The rule is that where there is a charter party the bill of lading operates as the receipt for the goods, and as a document of title passing the property of the goods, but not as varying the contract between the charterer and the shipowner."
 
 
 51
 See also, The G. R. Crowe, 294 F. 506, 508 (2 Cir. 1923), cert. denied 264 U.S. 586, 44 S.Ct. 335, 68 L.Ed. 862 (1924); The Iona, 80 F. 933 (5 Cir. 1897); Ministry of Commerce v. Marine Tankers Corp., 194 F.Supp. 161, 162-163 (S.D. N.Y.1960). The fact that the parties intended this result is borne out quite clearly by p 29 of the charter party which provides that any bill of lading "shall be without prejudice to the terms, conditions and exceptions of this Charter Party. . . ."
 
 
 52
 Therefore, in light of the fact that the ordinary burden of proof between a private shipper and carrier was not altered either by statute or contract, the rule of Commercial Molasses, supra, prevails. In that case, the Court held that the burden of proving a breach of the private carriage contract or of negligence by the bailee carrier was on the shipper. To be sure, the Court said that a shipper could make a prima facie case by simply establishing the loss of his goods and that the carrier then had a duty to come forward with information concerning the loss or risk a plaintiff's verdict, but it also clearly stated that if the trier of fact was left uncertain, the shipper had not met his burden,[6] see also, Hampton Roads Carriers, Inc. v. Allied Chemical Corp., 329 F.2d 387, 391 (4 Cir.), cert. denied, 379 U.S. 839, 85 S.Ct. 78, 13 L.Ed.2d 46 (1964).
 
 
 53
 There is no doubt that the shipper, by F.I.C. its subrogee, has failed in its burden of proof. Under the general exceptions clause of the charter party, p23,[7] the owner or carrier was not to be held liable for the loss of cargo on any account, unless it failed to exercise due diligence to make the ship seaworthy before she broke ground. Here, some of the possible causes of the loss are particularly exempted from owner liability, e. g., fire, explosion, danger or accident of the sea, or neglect in the navigation of the vessel. Moreover, by retaining authority to approve the design, plans and specifications of the vessel, to inspect all steps in the work of conversion and to reject any equipment or components of the ship, and finally by accepting the vessel as delivered from Bethlehem, the shipper is estopped from recovery on any theory of improper design or structural failure or collapse, see, Hampton Roads Carriers, supra, 329 F.2d at 392; Alcoa Steamship Co. v. United States, 94 F.Supp. 406, 407 (S. D.N.Y.1950). But, in any event, in a case such as this, where the shipper was unable to prove that his loss was occasioned by some cause for which the carrier was liable, there can be no recovery.
 
 
 54
 As for the cargo claim against Bethlehem, it stands on no better ground than the death claims against the ship-builder, which were dismissed for a failure to show that any fault on Bethlehem's part was a cause of the loss.
 
 
 55
 The Death Claimants have cross-appealed from the district court's denial of their motion for the imposition of punitive damages upon MTL, MSTC and Bethlehem. In view of our disposition of the claims for compensatory damages, Bethlehem is no longer concerned with this issue. As to the remaining parties, MTL and MSTC, we are satisfied that the trial court should be affirmed in its denial of punitive damages. A condition precedent to awarding them is a showing by the plaintiffs that the defendant was guilty of gross negligence, or actual malice or criminal indifference which is the equivalent of reckless and wanton misconduct. There is no evidence in this case to support a finding of any of these elements. Lake Shore R. Co. v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893). Even if there were some evidence of this sort, the award of punitive damages is discretionary with the trial court. The Amiable Nancy, 16 U.S. (3 Wheat.) 546, 4 L.Ed. 456 (1818); Precision Plating & Metal Finishing, Inc. v. Martin-Marietta Corp., 435 F.2d 1262 (5 Cir. 1970).
 
 
 56
 We affirm the denial of the petition of MTL and MSTC for exoneration or limitation of liability and affirm the allowance of the wrongful death claims against MTL and MSTC. We affirm the denial of the Death Claimants' motion for punitive damages and dismiss their cross-appeal on this point. We reverse the allowance of the wrongful death claims against Bethlehem and order the dismissal of the action as to that respondent. We reverse the district court's allowance of the cargo claim of F.I.C. against MSTC and MTL and affirm the dismissal of its cargo claims against Bethlehem. Judgments may enter accordingly with costs as follows:
 
 
 57
 The Death Claimants may recover their costs against MTL and MSTC; Bethlehem may recover its costs against the Death Claimants; and MSTC, MTL and Bethlehem may recover their costs against the cargo claimant.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 The trial court in its opinion, 312 F. Supp. 1081, 1098, cited Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania DeVapores, S.A. (The Perama), 388 F.2d 434 (2 Cir.), cert. denied 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968); and South, Inc. v. Moran Towing & Transportation Co. (The Vega), 360 F.2d 1002 (2 Cir. 1966), as standing for this proposition, but its reliance on them for the purpose was misplaced. Both are distinguishable from the present case. The Perama was carrying a cargo in foreign trade and came under the provisions of COGSA which were applied in the decision. The present case concerns private carriage between domestic ports to which neither COGSA or the Harter Act applies. The Vega was private carriage between domestic ports but it concerned a tow, the owner of which was suing the tug and its owner for loss of part of the tow-one of three ferryboats. The burden of proving the seaworthiness of the ferryboat was on the plaintiff-claimant. Under those circumstances his failure to prove seaworthiness resulted in the assumption that it must have been unseaworthy
 
 
 [2]
 The Death on the High Seas Act, 46 U.S.C. Sec. 761 et seq., in no way changes the burden of proof on tort claims
 
 
 [3]
 Because of the decision on MTL's liability in regard to the cargo, there is no need to decide whether or not F.I.C. waived the right of subrogation in its contract with TGS
 
 
 [4]
 Metropolitan Coal Co. v. Howard, 155 F. 2d 780, 782 (2 Cir. 1946), is inapposite here because the charter party in that case specifically incorporated the provisions of the Harter Act, and its burden of proof rules. Unfortunately, the case has sometimes been misread to apply burden of proof rules separate from those of the Harter Act, see, e. g., Hampton Roads Carriers, Inc. v. Allied Chemical Corp., 329 F.2d 387, 391 (4 Cir.), cert. denied, 379 U.S. 839, 85 S.Ct. 78, 13 L.Ed.2d 46 (1964)
 
 
 [5]
 The pertinent portion of the Bill of Lading reads:
 "This shipment is carried under and pursuant to the terms of the Tanker Voyage Charter Party dated as of April 8, 1960 at Jersey City, New Jersey, between Marine Transport Lines, Inc. and Texas Gulf Sulphur Company, as Charterer, and all the terms, conditions and exceptions of said Charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment. If this Bill of Lading is a document of title to which the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, or similar legislation giving statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels of August 25, 1924, applies by reason of the port of loading or discharge being in territory in which the said Act or other similar legislation is in force, this Bill of Lading shall have effect subject to the provisions of the said Act or other similar legislation, as the case may be, which shall be deemed incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act or other similar legislation. If any term of this Bill of Lading is repugnant to the said Act or other similar legislation as so incorporated, such terms shall be void to that extent but no further."
 
 
 [6]
 On occasion, the inferences permitted against the carrier by Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L. Ed. 89 (1941), have been misinterpreted actually to shift the burden of proof or "risk of non-persuasion." Sweeney v. Erving, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815 (1913), relied upon by the Court in Commercial Molasses, 314 U.S. at 113, 62 S.Ct. 156, makes quite plain that no such burden shifting was intended, see also C. McCormick, Evidence, Secs. 307, 308, at 638-641 (1954)
 
 
 [7]
 p 23(a) of the Charter Party reads as follows:
 "23. General Exceptions Clause. (a) Neither the Vessel nor the master or Owner shall be or shall be held liable for any loss of or damage or delay to the cargo or for any failure in performing hereunder arising or resulting from: -Any act, neglect or default of the master, pilots, mariners or other servants of Owner in the navigation or management of the Vessel; barratry; fire, unless caused by the personal design or neglect of Owner; collision, stranding, perils, dangers or accidents of the seas or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk or any loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of Charterer, shipper, consignee, owner of the goods or holder of the bill of lading, their agents and representatives; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery, equipment or appurtenances; unseaworthiness of the Vessel whether existing at the beginning of the voyage or developing during the voyage unless caused by want of due diligence on the part of Owner to make the Vessel seaworthy or to have her properly manned, equipped, and supplied; leakage; shrinkage; evaporation; change in quality of the cargo; handling or transportation losses; difference between actual or reported intake and outturn quantities; stowage or contact with or leakage from other cargo; discoloration; contamination; deterioration; any consequence arising out of shipping more than one grade of cargo; or from any other cause arising without the actual fault or privity of Owner. And neither the Vessel, her master or Owner, nor Charterer shall, unless otherwise in this Charter Party expressly provided, be responsible for any loss of or damage or delay to or failure to discharge or deliver the cargo arising or resulting from:-Act of God; act of war; act of public enemies; pirates or assailing thieves; arrest or restraint of princes, rulers or people; seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strikes, lockouts, stoppage or restraint of labor from whatever cause whether partial or general; or riot or civil commotion. No exemption afforded Charterer under this Clause shall relieve Charterer of or diminish its obligations for payment of any sums due Owner under other provisions of this Charter Party."